**2021 IL 126086**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket Nos. 126086, 126087, 126088)

REUBEN D. WALKER *et al.*, Appellees, v. ANDREA LYNN CHASTEEN (The People of the State of Illinois *ex rel.* Kwame Raoul, Attorney General of Illinois, *et al.*, Appellants).

*Opinion filed June 17, 2021.*

JUSTICE CARTER delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Michael J. Burke, and Overstreet concurred in the judgment and opinion.

Justice Theis dissented, with opinion.

Justice Neville took no part in the decision.

**OPINION**

¶ 1        In this direct appeal, we address the constitutionality of section 15-1504.1 of the Code of Civil Procedure (Code) (735 ILCS 5/15-1504.1 (West 2012)), as well as sections 7.30 and 7.31 of the Illinois Housing Development Act (Act) (20

ILCS 3805/7.30, 7.31 (West 2012)). Section 15-1504.1 of the Code created a $50 filing fee for residential mortgage foreclosure cases. 735 ILCS 5/15-1504.1 (West 2012). Sections 7.30 and 7.31 of the Act created programs funded by the fee created in section 15-1504.1. 20 ILCS 3805/7.30, 7.31 (West 2012). The circuit court of Will County determined that these statutes violate the free access, due process, equal protection, and uniformity clauses of the Illinois Constitution of 1970. Ill. Const. 1970, art. I, §§ 2, 12, art. IX, § 2. For the following reasons, we affirm the order of the circuit court and remand for further proceedings.

¶ 2                                  BACKGROUND

¶ 3        This case involves two underlying residential mortgage foreclosure lawsuits. In April 2012, plaintiff Reuben D. Walker filed a mortgage foreclosure complaint in Will County. In August 2015, plaintiff M. Steven Diamond filed a mortgage foreclosure complaint in Cook County. In filing those cases, each plaintiff paid a $50 "add on" filing fee under section 15-1504.1 of the Code.

¶ 4        In October 2012, Walker filed a putative class action complaint against the clerk of the circuit court of Will County, challenging, *inter alia*, the constitutionality of section 15-1504.1. The trial court certified a class of plaintiffs, consisting of all individuals and entities who had paid the $50 filing fee up to the time Walker had filed his mortgage foreclosure action, and a class of defendants consisting of all circuit court clerks in Illinois. The State, through the Attorney General, was allowed to intervene in the matter. See Ill. S. Ct. R. 19 (eff. Sept. 1, 2006); 735 ILCS 5/2-408(c) (West 2012).

¶ 5        In November 2013, the trial court granted partial summary judgment in favor of Walker, finding that circuit court clerks fall within the judicial fee officer prohibition in article VI, section 14, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 14) and that the provision in section 15-1504.1 authorizing 2% of the filing fee to be retained by the clerk for administrative expenses creates an impermissible fee office (735 ILCS 5/15-1504.1 (West 2012)). The trial court declared the statute unconstitutional on its face.

¶ 6        On September 24, 2015, this court reversed and remanded the case, holding that circuit court clerks did not fall within the state constitutional provision prohibiting

fee officers in the judicial system. *Walker v. McGuire*, 2015 IL 117138. This court did not address the other constitutional claims raised by Walker.

¶ 7        On June 9, 2016, following remand, plaintiffs' counsel amended their complaints to add Diamond as an additional named party. On December 4, 2018, plaintiffs filed a second amended complaint. The second amended complaint asserted a putative class action against the Illinois circuit court clerks. Plaintiffs sought, *inter alia*, a permanent injunction prohibiting enforcement of the statutes at issue and return of monies collected.

¶ 8        Relevant to this appeal, plaintiffs' second amended complaint alleged, *inter alia*, that section 15-1504.1 of the Code (735 ILCS 5/15-1504.1 (West 2012)) and sections 7.30 and 7.31 of the Act (20 ILCS 3805/7.30, 7.31 (West 2012)) violate the equal protection, due process, and uniformity clauses of the Illinois Constitution of 1970 (Ill. Const. 1970, art I, § 2, art. IX, § 2). Plaintiffs also alleged that the statutes violate the constitutional right to obtain justice freely (the "free access" clause) (Ill. Const. 1970, art. I, § 12). Plaintiffs sought declaratory and injunctive relief and a return of all filing fees paid pursuant to section 15-1504.1. Defendants maintained that the statutes are constitutional. The Cook County circuit clerk also argued that the voluntary payment doctrine precluded plaintiffs' claims because they did not pay the filing fee "under protest."

¶ 9        The parties filed cross-motions for summary judgment. The trial court granted partial summary judgment in favor of plaintiffs. The court determined that the plaintiffs paid the fee under duress and that, therefore, the voluntary payment doctrine did not apply. The court further found that the statutes at issue are facially unconstitutional because the challenged provisions violate the free access, equal protection, due process, and uniformity clauses of the Illinois Constitution of 1970.

¶ 10        The trial court entered a permanent injunction enjoining the Illinois circuit courts from enforcing and following the statutes at issue as they are currently enacted. The court stayed enforcement of the injunction to provide this court an opportunity to review the case.

¶ 11        The Illinois Attorney General, on behalf of the State of Illinois, the Cook County circuit clerk, and the Will County circuit clerk filed separate direct appeals. See Ill. S. Ct. R. 302(a) (eff. Oct. 4, 2011). This court consolidated those appeals.

The Attorney General and the Cook County circuit clerk filed separate briefs in this appeal. This court granted the Will County circuit clerk leave to join and adopt the Attorney General's brief.

¶ 12                                      ANALYSIS

¶ 13        This matter comes for our review on the circuit court's grant of summary judgment in favor of plaintiffs. Summary judgment is appropriate if the pleadings, depositions, admissions, and affidavits on file establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018); *Coleman v. East Joliet Fire Protection District*, 2016 IL 117952, ¶ 20. A circuit court's order granting summary judgment is reviewed *de novo*. *Cohen v. Chicago Park District*, 2017 IL 121800, ¶ 17.

¶ 14        In these proceedings, plaintiffs challenged the constitutionality of section 15-1504.1 of the Code (735 ILCS 5/15-1504.1 (West 2012)) and sections 7.30 and 7.31 of the Act (20 ILCS 3805/7.30, 7.31 (West 2012)).[1] These statutes were enacted as part of the "Save Our Neighborhoods Act," in response to the mortgage foreclosure crisis of 2010. The legislative goal was to "create[ ] additional programs for people in foreclosure problems" and to "help people who needed help with their mortgage situations and in our foreclosure-plagued society." See General Assembly, House Civil Judiciary Comm. Transcripts (May 7, 2010) at 10:11-16, 4:16 to 6:1; 6:19-21.

¶ 15        Section 15-1504.1 of the Code requires mortgage foreclosure plaintiffs to pay the clerk of the circuit court an additional fee for the Foreclosure Program Prevention Fund. 735 ILCS 15/15-1504.1 (West 2012). Section 15-1504.1(a-5) further requires a portion of the fees to be deposited into the Abandoned Residential Property Municipality Relief Fund (Abandoned Residential Property Fund). *Id.* § 15-1504.1(a-5). The clerk of the court retains 2% of the fee collected and remits

_____

[1]We note that the statutes at issue have been amended several times since their adoption. All parties agreed below that the various amendments did not materially change the provisions relative to the issues presented in this appeal.

- 4 -

the remainder to the state Treasurer for the Foreclosure Prevention Program Fund and the Abandoned Residential Property Fund. *Id.* § 15-1504.1(a-5)(2).

¶ 16 In turn, section 7.30 of the Act requires the Illinois Housing Development Authority (Housing Authority) to grant 25% of the Foreclosure Prevention Program Fund to approved housing counseling agencies outside Chicago, based in part on the number of foreclosures, and 25% to approved counseling agencies in Chicago for housing counseling or foreclosure prevention services. 20 ILCS 3805/7.30(b)(1), (2) (West 2012). Section 7.30 also requires the Housing Authority to grant 25% to approved community-based organizations outside Chicago for approved foreclosure prevention outreach and 25% for such programs in Chicago. *Id.* § 7.30(b)(3), (4). " 'Approved community-based organization' " is defined as a "not-for-profit entity that provides educational and financial information to residents of a community through in-person contact" but excludes organizations providing legal services. *Id.* § 7.30(b-5). An " '[a]pproved foreclosure prevention outreach program' " includes prepurchase and postpurchase home counseling and education regarding the foreclosure process. *Id.*

¶ 17 Section 7.31 of the Act requires the Housing Authority to distribute 30% of the proceeds from the Abandoned Residential Property Fund for grants to municipalities in Cook County, other than the City of Chicago, and to Cook County. *Id.* § 7.31(b)(1). Section 7.31 requires 25% of these funds for grants to the City of Chicago; 30% of these funds for grants to municipalities in Du Page, Kane, Lake, McHenry, and Will Counties and to those counties; and 15% of those funds for grants to municipalities and counties in Illinois other than Cook, Du Page, Kane, Lake, McHenry, and Will Counties. *Id.* § 7.31(b)(2)-(4).

¶ 18 Section 7.31(a) provides that the monetary grants may be used for such things as cutting grass at abandoned properties, trimming trees and bushes, extermination of pests, removing garbage and graffiti, installing fencing, and demolition. *Id.* § 7.31(a). Section 7.31(a) also contains a catchall provision that further widens permissible expenditures to include general "repair or rehabilitation of abandoned residential property." *Id.*

¶ 19                          Voluntary Payment Doctrine

¶ 20        Before we address the constitutionality of the statutes, we must address a preliminary issue that may make it unnecessary to reach the constitutional issues. See *Coram v. State of Illinois*, 2013 IL 113867, ¶ 56 (a court must "consider nonconstitutional issues first and consider constitutional issues only if necessary to the resolution of [the] case"). The clerk of the circuit court of Cook County argues that the voluntary payment doctrine bars plaintiffs' claims for fees paid under section 15-1504.1 because plaintiffs failed to establish proof of either involuntary payment or an exception to the doctrine. The clerk submits that the decision of the circuit court should be reversed on that basis and that this court need not reach the merits of the constitutional claims. The clerk argues that, if plaintiffs' claim fails under the voluntary payment doctrine, then the plaintiff class claims fail as well.

¶ 21        Plaintiffs respond that the circuit court properly found that the duress exception applied to the voluntary payment doctrine. Therefore, the voluntary payment doctrine does not apply to this case.

¶ 22        "The common-law voluntary payment doctrine embodies the ancient and 'universally recognized rule that money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered back on the ground that the claim was illegal.' " *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶ 22 (quoting *Illinois Glass Co. v. Chicago Telephone Co.*, 234 Ill. 535, 541 (1908)). To avoid application of the voluntary payment doctrine, "it is necessary to show not only that the claim asserted was unlawful but also that the payment was not voluntary, such as where there was some necessity that amounted to compulsion and payment was made under the influence of that compulsion." *Id.* ¶ 23. "In addition to compulsion or duress, other recognized exceptions to the voluntary payment doctrine include fraud or misrepresentation or mistake of a material fact." *Id.* ¶ 24.

¶ 23        In finding that the duress exception applied to the voluntary payment doctrine, the circuit court relied on *Midwest Medical Records Ass'n v. Brown*, 2018 IL App (1st) 163230. The Cook County circuit clerk contends that the circuit court's

reliance on *Midwest Medical Records* was misplaced and that plaintiffs did not make a showing of duress.

¶ 24   We find *Midwest Medical Records* persuasive. In that case, the plaintiffs brought an action alleging that a $60 fee they paid to the Cook County circuit clerk for filing motions to reconsider interlocutory orders in their underlying cases violated the Clerks of Courts Act (705 ILCS 105/1 *et seq.* (West 2014)). *Midwest Medical Records*, 2018 IL App (1st) 163230, ¶¶ 3-4. The circuit court dismissed plaintiffs' action based on the voluntary payment doctrine, rejecting the plaintiffs' claims that they paid the fees involuntarily and under duress because they would have been denied their constitutional right to challenge interlocutory orders and suffered detrimental consequences and adverse judgments against them if they had not paid the fees. *Id.* ¶ 7.

¶ 25   In examining the voluntary payment doctrine, the appellate court in *Midwest Medical Records* noted that " '[t]he kind of duress necessary to establish payment under compulsion has been expanded over the years.' " *Id.* ¶ 24 (quoting *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 848 (1995)). The appellate court in *Midwest Medical Records* observed that duress may be implied and has included duress of property and compulsion of business. *Id.* ¶¶ 25-28. The appellate court recognized that

> "[i]n determining whether payment is made under duress, the main consideration is whether the party had a choice or option, *i.e.*, whether there was 'some actual or threatened power wielded over the payor from which he has no immediate relief and from which no adequate opportunity is afforded the payor to effectively resist the demand for payment.' " *Id.* ¶ 28 (quoting *Smith*, 276 Ill. App. 3d at 849).

The appellate court in *Midwest Medical Records* concluded that duress existed because the plaintiffs "could not avail themselves of the judicial process without payment" and that the "[p]laintiffs' refusal to pay the fee would have immediately resulted in loss of access to the courts to challenge orders entered against them." *Midwest Medical Records*, 2018 IL App (1st) 163230, ¶ 32.

¶ 26   In this case, after a hearing on the issue, the circuit court found that the duress exception applied for two "independently sufficient reasons." First, following the

reasoning of *Midwest Medical Records*, the court found that plaintiffs in this case would have been restricted from reasonably accessing the court system because they would have lost a substantial right if they did not pay the fee. The court noted that, at the hearing on this issue, the Illinois Attorney General conceded that duress necessarily and inherently exists in court-filing fee cases. Second, the court recounted Walker's testimony at the hearing that he was anxious to get his foreclosure case filed and exercise his rights as a mortgagee due to concerns of fraud and other complications in the underlying case. Walker understood that he was required to pay the fee to file his lawsuit. He was not aware that he could pay the fee under protest and believed he was ineligible for a fee waiver. Walker further testified that, if the Will County circuit clerk had informed him that the filing fee was voluntary and not required, he would not have paid the fee. The court found that Walker's testimony was compelling and credible. For these reasons, the court found that Walker established he was under duress when he paid the filing fee and that the voluntary payment doctrine did not defeat plaintiffs' claims.

¶ 27     The Cook County circuit clerk submits that the circuit court overread the holding in *Midwest Medical Records* and that it offers no aid to plaintiffs here. According to the clerk, the holding in *Midwest Medical Records* was nuanced where the appellate court found the trial court erred in holding that plaintiffs' claims were insufficient to plead duress and failed to show they were denied access to a service that was necessary to them. According to the Cook County circuit clerk, *Midwest Medical Records* held that, at a minimum, the court should not have resolved the issue of duress as a matter of law on the pleadings, as it is generally a question of fact. The clerk also argues that the circuit court erred in relying on comments made by the Attorney General during the hearing. The comments are not proof, and they do not constitute evidence of alleged duress. The clerk also argues that Walker's testimony was insufficient to support a factual finding that he was under duress when he paid the fee because Walker also testified that he never directed his attorneys to ask for a waiver of the fee or for the court not to charge the fee.

¶ 28     We agree with the circuit court that the duress exception applies in this case. Clearly, when a filing fee is required for filing a mortgage foreclosure, the fee implicates access to the court system, and plaintiffs would have lost reasonable access to the judicial process without payment. Plaintiffs' refusal to pay the fee

would have resulted in loss of access to the courts to pursue a mortgage foreclosure, a property right. In our view, when a mandatory filing fee is required to access the judicial process, duress may be implied. Indeed, the Illinois Attorney General conceded this at the hearing on the issue, and neither the Attorney General nor the Will County circuit clerk have joined in the Cook County circuit clerk's argument that the voluntary payment doctrine bars plaintiffs' constitutional claims. We also agree with the circuit court that Walker's testimony was sufficient to establish that he was under duress when he paid the filing fee. We therefore hold that the voluntary payment doctrine does not bar plaintiffs from challenging the constitutionality of the statutes at issue in this appeal. We next consider the constitutionality of the statutes at issue in this appeal.

¶ 29                           Constitutionality of the Statutes

¶ 30     The constitutionality of a statute is a question of law that is reviewed *de novo*. *Dynak v. Board of Education of Wood Dale School District 7*, 2020 IL 125062, ¶ 15. Statutes carry a strong presumption of constitutionality, and this court will construe a statute to preserve its constitutionality if reasonably possible. *People v. Masterson*, 2011 IL 110072, ¶ 23. The party challenging the constitutionality of a statute bears the burden of establishing the statute's invalidity. *Id.*

¶ 31     Here, the circuit court determined that the statutes are facially unconstitutional. As the circuit court properly recognized, "[a] facial challenge to the constitutionality of a legislative enactment is the most difficult challenge to mount successfully [citation], because an enactment is facially invalid only if no set of circumstances exists under which it would be valid." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305-06 (2008). "Successfully making a facial challenge to a statute's constitutionality is extremely difficult, requiring a showing that the statute would be invalid under *any* imaginable set of circumstances." (Emphasis in original.) *In re M.T.*, 221 Ill. 2d 517, 536 (2006). A successful attack voids a statute for all parties in all contexts, and for that reason, findings of facial invalidity are made only as a last resort. See *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009).

¶ 32     We now examine the trial court's decision that section 15-1504.1 of the Code (735 ILCS 5/15-1504.1 (West 2012)) and sections 7.30 and 7.31 of the Act (20

ILCS 3805/7.30, 7.31 (West 2012)) violate the right to obtain justice freely (the "Free Access" clause) (Ill. Const. 1970, art. I, § 12). Article I, section 12, of the Illinois Constitution of 1970 provides:

> "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly."

¶ 33 Provisions similar to article I, section 12, of the Illinois Constitution of 1970 were contained in the constitutions of 1870 (Ill. Const. 1870, art. II, § 19), 1848 (Ill. Const. 1848, art. XIII, § 12), and 1818 (Ill. Const. 1818, art. VIII, § 12). See, *e.g.*, *Sullivan v. Midlothian Park District*, 51 Ill. 2d 274, 277 (1972). That every wrong shall have a remedy and that justice shall be obtained by law, freely, completely, and promptly have long been foundational principles in English and American jurisprudence. See *Solem v. Helm*, 463 U.S. 277, 285 n.10 (1983) ("There can be no doubt that the Declaration of Rights guaranteed at least the liberties and privileges of Englishmen. See A. Nevins, The American States During and After the Revolution 146 (1924) (Declaration of Rights 'was a restatement of English principles—the principles of Magna Charta . . . and the Revolution of 1688'); A. Howard, The Road from Runnymede: Magna Carta and Constitutionalism in America 205-207 (1968).") These principles date back more than 800 years to article 40 of the Magna Carta of 1215: "To no one will we sell, to no one will we refuse or delay, right or justice." Magna Carta 1215, 17 John, art. 40.

> "This language–recognized as the first codification of the right to a remedy–was a capstone provision in a document designed in significant part to secure a judicial system that would respect and enforce individual rights. We can readily trace this language from its codification in Magna Carta to its elaboration by Sir Edward Coke in his Second Institutes, to Blackstone's restatement in his Commentaries, and ultimately to state constitutional provisions operative today." Benjamin P. Cover, *The First Amendment Right to a Remedy*, 50 U.C. Davis L. Rev. 1741, 1755 (2017) (citing Edward Coke, 2 Institutes of the Lawes of England 45, 55 (1642), and 1 William Blackstone, Commentaries on the Laws of England *32-33 (1768)).

¶ 34 Indeed, this court has long held that a general revenue law that has the effect of "compel[ling] a man to buy justice" is unconstitutional in that "every person in this

State ought to obtain right and justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws." *Wilson v. McKenna*, 52 Ill. 43, 48-49 (1869); see also *Reed v. Tyler*, 56 Ill. 288, 292 (1870) (same); *Senichka v. Lowe*, 74 Ill. 274, 277 (1874) (same).

¶ 35    The test of a law's constitutionality depends largely on the nature of the right that is claimed. See *In re D.W.*, 214 Ill. 2d 289, 310 (2005). As this court recognized in *In re D.W.*:

"Classification of the right affected is critical because the nature of the right dictates the level of scrutiny courts employ in determining whether the statute in question passes constitutional muster. Unless a fundamental constitutional right is implicated, the rational basis test applies, and the statute will be upheld so long as it bears a rational relationship to a legitimate state interest. [Citation.] However, where the constitutional right at issue is one considered 'fundamental,' the presumption of constitutionality is weaker, and courts must subject the statute to the more rigorous requirements of strict scrutiny analysis. [Citations.]" *Id*.

Here, as well as in the circuit court, the parties dispute whether strict scrutiny or the rational basis test applies to plaintiffs' constitutional claims. "To withstand the strict scrutiny standard, a statute must serve a compelling state interest, and be narrowly tailored to serve the compelling interest, *i.e.*, the legislature must use the least restrictive means to serve the compelling interest." *Lulay v. Lulay*, 193 Ill. 2d 455, 470 (2000). Under the rational basis test, a court will uphold a statute if it bears a rational relationship to a legitimate legislative purpose and is not arbitrary or unreasonable. *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 122 (2004).

¶ 36    In *Crocker v. Finley*, 99 Ill. 2d 444, 451 (1984), this court recognized that the central issue in a claim that a filing fee violates the free access and due process clauses of the Illinois Constitution was whether the legislature may impose a fee on a limited group of plaintiffs when the funds went to the state treasury to fund a general welfare program. This court applied the rational basis test in *Crocker* but did not explain why that was the proper test for either of the constitutional claims.

¶ 37    We find that the rational basis test is generally applicable to free access clause claims involving court filing fees. First, the fee in *Crocker* charged to petitioners

filing for a dissolution of marriage did not involve a suspect classification such as race, national origin, or gender. In cases not involving a suspect classification, the rational basis test applies. See *People v. Botruff*, 212 Ill. 2d 166, 176-77 (2004). Second, while there is a fundamental right to access the courts, there is not a fundamental right to such access without expense. *Crocker*, 99 Ill. 2d at 454-55. For these reasons, the rational basis test applies to a claim alleging that a filing fee violates the free access clause when the fee does not involve a suspect classification. Accordingly, we must determine whether the additional $50 filing fee imposed on residential mortgage foreclosure litigants under the statutes at issue in this appeal meets the rational basis test.

¶ 38     The circuit court relied on *Crocker*'s rationale to determine that the statutes violate the free access clause. In *Crocker*, this court considered the constitutionality of a $5 additional filing fee imposed on petitioners filing for dissolution of marriage. The additional filing fee was to be used to fund shelters and other services for victims of domestic violence. Although the $5 charge was referred to as a fee by the statute, this court deemed the charge a litigation tax rather than a fee. *Id.* at 452. "[C]ourt charges imposed on a litigant are fees if assessed to defray the expenses of [a party's] litigation. On the other hand, a charge having no relation to the services rendered, assessed to provide general revenue rather than compensation, is a tax." *Id.*

¶ 39     *Crocker* recognized, however, that statutes imposing litigation taxes do not necessarily offend the free access clause. *Id.* This court then examined the purposes for which taxes may be imposed on litigants. All cases in which this court previously considered challenges to court filing-fee statutes involved a fee or tax collected for court-related purposes. *Id.* at 453. This court had previously upheld a county law-library tax on litigants, fees on litigants who file jury demands, and filing fees for tax objections collected to defray court expenses, and in each of those cases, the relationship between the tax or fee and the court system was clear. *Id.* In *Crocker*, this court concluded that "court filing fees and taxes may be imposed only for purposes relating to the operation and maintenance of the courts. We consider this requirement to be inherent in our Illinois constitutional right to obtain justice freely." *Id.* at 454. Indeed, in reference to the free access clause, *Crocker* restated these important principles:

" ' " 'The constitution does not guarantee to the citizen the right to litigate without expense, but simply protects him from the imposition of such terms as unreasonably and injuriously interfere with his right to a remedy in the law or impede the due administration of justice \*\*\*.' " ' " *Id.* at 454-55 (quoting *Ali v. Danaher*, 47 Ill. 2d 231, 236 (1970), quoting *Williams v. Gottschalk*, 231 Ill. 175, 179 (1907), quoting *Adams v. Corriston*, 7 Minn. 456, 461 (1862)).

See also *Sanko v. Carlson*, 69 Ill. 2d 246, 250 (1977).

¶ 40    Applying these principles, we concluded that the $5 charge in *Crocker* interfered unreasonably with plaintiffs' access to courts. *Crocker*, 99 Ill. 2d at 455. We reasoned that litigants

"should not be required, as a condition to their filing, to support a general welfare program that relates neither to their litigation nor to the court system. If the right to obtain justice freely is to be a meaningful guarantee, it must preclude the legislature from raising general revenue through charges assessed to those who would utilize our courts." *Id.*

¶ 41    This court found that the relationship between domestic shelters and programs was "simply too remote" to save the $5 tax from its constitutional shortcomings. *Id.* We found "no rational basis for imposing this tax on only those petitioners filing for dissolution of marriage, thereby causing members of that class to bear the cost of maintaining the public welfare program provided, while excluding other classes of taxpayers." *Id.* at 457. Thus, *Crocker* rejected arguments that the $5 litigation tax would improve the overall administration of justice, finding that the asserted relationship was "too remote" and concluding that the service-funding scheme, if permitted, would open the door to "countless other social welfare programs." *Id.* at 455-56.

¶ 42    This court has also found a statute requiring county clerks to place part of the marriage license fee into a domestic abuse fund to be unconstitutional where the relationship between those who were being taxed and those who were benefitting from the tax was too remote. *Boynton v. Kusper*, 112 Ill. 2d 356, 367-68 (1986). As the circuit court correctly concluded, the relationship between the fee and its impact on the operation and maintenance of the courts cannot be too attenuated; rather, it must be relatively direct, clear, and ascertainable.

¶ 43    Here, the $50 filing charge established under section 15-1504.1 of the Code, although called a "fee," is, in fact, a litigation tax, as was the charge in *Crocker*. The charge here has no direct relation to expenses of a petitioner's litigation and no relation to the services rendered. Rather, the charge is assessed solely to raise revenue for the Foreclosure Prevention Fund and the Abandoned Residential Property Fund. Thus, the $50 additional foreclosure filing charge is a tax on litigation.

¶ 44    According to the State and the Will County circuit clerk, however, the foreclosure fee is reasonably related to court operations and maintenance because it is designed to reduce foreclosures and their attendant social problems. The State and the Will County circuit clerk also argue that the Abandoned Property Fund is reasonably related to reducing the courts' caseloads because its grant program could mitigate the many ill effects of property abandonment that give rise to litigation from increased criminal prosecutions, tort actions, and foreclosure proceedings. The State and the Will County circuit clerk acknowledge that the grant funds may be used for cutting neglected grass and weeds; removing nuisance bushes and trees; exterminating pests; removing debris and graffiti; and closing off, demolishing, or rehabilitating abandoned residential property. However, according to the State and the Will County circuit clerk, these things are directly related to combating blight and severe negative effects caused by property abandonment and remediating those effects reduces litigation and strains on the judicial system.

¶ 45    Similarly, the Cook County circuit clerk argues before this court that the foreclosure fee and distributions from the fund provide services to prevent foreclosure actions, thus reducing the number of mortgage foreclosures. According to the Cook County circuit clerk, the fee and funds facilitate the smooth functioning of the court system.

¶ 46    We find that the relationship asserted by the State, the Will County circuit clerk, and the Cook County circuit clerk is too remote. The fees, instead, are a revenue-raising measure designed to fund a statewide social program administered by the Illinois Housing Development Authority. The Illinois Housing Development Authority utilizes these funds to make monetary grants to approved counseling agencies for housing counseling and to community organizations for foreclosure prevention programs and to finance such things as cutting grass, tree trimming, and

- 14 -

rehabilitating abandoned residential property. The benefits for foreclosure prevention programs are indirect at best and have no direct relation to the administration of the court system. Any relation of the filing fee to maintenance and operation of the courts is too attenuated and represents the type of social welfare program tax that *Crocker* found prohibited by the free access clause. The grants for repair and rehabilitation of abandoned properties, cutting grass, picking up trash, etc., are even further removed than the counseling services from the operation and maintenance of the courts. As the circuit court recognized, "the statutory scheme is tantamount to a litigation-tax funded neighborhood beautification plan."

¶ 47     We agree with the circuit court and conclude that the statutes violate the free access clause because the $50 fee unreasonably interferes with foreclosure litigants' access to the courts. Under the free access clause, court filing fees must be related to services rendered by the courts or maintenance of the courts. *Crocker*, 99 Ill. 2d at 454-55. "If the right to obtain justice freely is to be a meaningful guarantee, it must preclude the legislature from raising general revenue through charges assessed to those who would utilize our courts." *Id.* at 455.

¶ 48     We therefore hold that there is no rational basis for imposing this filing fee on mortgage foreclosure litigants, requiring them to bear the cost of maintaining a social welfare program, while excluding other classes of taxpayers from the burden. The statutes therefore violate the free access clause.

¶ 49     We need not address whether the statutes violate any other provisions of the Illinois Constitution because we have already determined that the statutes at issue are facially unconstitutional as violative of the free access clause. See *Hertz Corp. v. City of Chicago*, 2017 IL 119945, ¶ 31. We therefore affirm the judgment of the circuit court and remand the cause to the circuit court of Will County for further proceedings.

¶ 50                                   CONCLUSION

¶ 51     For the foregoing reasons, we affirm the judgment of the circuit court of Will County and remand the cause for further proceedings consistent with this opinion.

- 15 -

¶ 52       Circuit court judgment affirmed.

¶ 53       Cause remanded.


¶ 54       JUSTICE THEIS, dissenting:

¶ 55       I respectfully disagree with the majority's holding that there is no rational basis for imposing a $50 filing charge on residential mortgage foreclosure litigants and that therefore the charge violates the free access clause of the Illinois Constitution. The majority reaches this conclusion by improperly applying a heightened scrutiny rather than the proper rational basis standard. Compounding this problem, the majority renders its determination without ever even considering, let alone analyzing, the context surrounding the imposition of these charges. When viewed under the proper legal framework and the settled legal principles that apply to this case, the majority's holding is conclusory and untenable.

¶ 56       It is well settled that the free access clause of the state constitution does not create a fundamental right to litigate without expense. *Crocker v. Finley*, 99 Ill. 2d 444, 454 (1984). Instead, it simply protects from the imposition of terms that unreasonably and injuriously interfere with the right to a remedy in the law or impede the due administration of justice. *Ali v. Danaher*, 47 Ill. 2d 231, 236 (1970).

¶ 57       Where, as here, a statute does not affect fundamental rights or affect a suspect class, we apply a rational basis test to assess its constitutionality. *People v. Breedlove*, 213 Ill. 2d 509, 518 (2004). Although the majority frames the issue as whether the filing fee imposed on residential mortgage foreclosure litigants "meets the rational basis test" (*supra* ¶ 37), the majority fails to fully explain and fully consider the contours of rational basis review here.

¶ 58       Under rational basis review, we generally determine "whether there is a legitimate governmental interest behind the legislation and, if so, whether there is a *reasonable* relationship between that interest and the means the governing body has chosen to pursue it." (Emphasis added.) *LMP Services, Inc. v. City of Chicago*, 2019 IL 123123, ¶ 17. Further, when considering whether a legislative enactment survives rational basis review, courts do not consider the wisdom of the enactment or whether it is even the best means of achieving its goal. *Arangold Corp. v.*

*Zehnder*, 204 Ill. 2d 142, 147 (2003) ("The judgments made by the legislature in crafting a statute are not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").

¶ 59 More fundamentally, the test does not require narrow tailoring; it only requires rationality and is highly deferential. Thus, under the rational basis test, " 'the court may hypothesize reasons for the legislation, even if the reasoning advanced did not motivate the legislative action.' " (Emphasis omitted.) *Piccioli v. Board of Trustees of Teachers' Retirement System*, 2019 IL 122905, ¶ 20 (quoting *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704, ¶ 24). " 'If there is any conceivable basis for finding a rational relationship, the law will be upheld.' " *Id.* (quoting *People ex rel. Lumpkin v. Cassidy*, 184 Ill. 2d 117, 124 (1998)). Not every provision in a law must share a single objective. See *Crusius v. Illinois Gaming Board*, 216 Ill. 2d 315, 333 (2005). Moreover, " '[w]hether a statute is wise and whether it is the best means to achieve the desired result are matters for the legislature, not the courts.' " *Piccioli*, 2019 IL 122905, ¶ 20 (quoting *Moline School District No. 40 Board of Education*, 2016 IL 119704, ¶ 28).

¶ 60 The free access clause qualifies the rational basis standard generally applied to the broader concept of due process by identifying in advance the legitimate governmental interest of the legislature—the operation and maintenance of the court system. Thus, the charges need to be rationally related to the operation and maintenance of the court system. *Crocker*, 99 Ill. 2d at 454.

¶ 61 The enactment at issue here is presumed to be constitutional, and the party challenging the legislative enactment bears the burden of proving a clear violation. *People v. Coty*, 2020 IL 123972, ¶ 22. We must uphold its constitutionality if reasonably possible to do so. *Id.* It is against this backdrop of legal authority that we must consider this case.

¶ 62 The majority reasons that the charges are not rationally related to court operations or maintenance because the charges that fund the foreclosure prevention programs are too "remote" and have no "direct relation" to the administration of the court system. *Supra* ¶ 46. The majority additionally finds the charges that fund the abandoned property fund are further attenuated and are tantamount to a " 'neighborhood beautification plan.' " *Supra* ¶ 46.

- 17 -

¶ 63 To be sure, the rational relationship requirement does not mean that filing fees must remain with the court itself or benefit a particular plaintiff or his case directly. Rather, as long as a filing fee relates generally to the overall operation of the court system, including providing benefits to litigants or conserving court resources, it will be upheld under rational basis review. See *Rose v. Pucinski*, 321 Ill. App. 3d 92, 99 (2001) (upholding arbitration fee that funded third parties because it "serves solely to improve the overall administration of the court system," which benefitted the plaintiffs "by freeing the litigation calendars, courtrooms, judges, and ancillary personnel that otherwise would be engaged in such arbitrable cases to attend to matters which may well include cases in plaintiffs' categories"); *Mellon v. Coffelt*, 313 Ill. App. 3d 619, 631 (2000) (upholding mandatory arbitration fee that "may operate to expedite cases within the court system"); *Wenger v. Finley*, 185 Ill. App. 3d 907, 914-15 (1989) (upholding dispute resolution fee remitted to non-court-annexed domestic resolution centers that provide services to litigants despite arguments that these centers were not related to the judicial system).

¶ 64 The majority arrives at its conclusion that the connection to court operations and maintenance is too remote without even mentioning, let alone analyzing or assessing the relevant context of, these foreclosure litigation charges or the relevant legislative history and purpose of the legislation. As seen under the appropriate legal framework and in the proper context, it is evident that the charges at issue here are indeed rationally related to tackling a foreclosure "tsunami" affecting the ability of the court system to function. Simply put, that is all that is required to sustain rational basis review.

¶ 65 At the time this legislation was added by Public Act 96-1419 (eff. Oct. 1, 2010), the country was mired in a mortgage foreclosure crisis. Nationally, it was recognized that, "[f]rom July 2007 through August 2009, 1.8 million homes were lost to foreclosure and 5.2 million more foreclosures were started. One in eight mortgages [were] in foreclosure or default. Each month, an additional 250,000 foreclosures [were] initiated." Congressional Oversight Panel, *October Oversight Report: An Assessment of Foreclosure Mitigation Efforts After Six Months*, at 3 (Oct. 9, 2009), https://web.archive.org/web/20100203000339/http://cop.senate.gov/documents/cop-100909-report.pdf [https://perma.cc/6AJ5-ZDVS].

¶ 66　　　In response, both the federal and state governments jumped into the fray to stop the hemorrhaging. The Attorney General of Illinois recognized that "tens of thousands of Illinoisans [were] poised to lose their homes in the collapse of the subprime mortgage industry" and called for a coordinated statewide effort to "curb abuses in the mortgage lending industry." *Madigan Announces Comprehensive Strategy to Address Looming Home Foreclosure Crisis in Illinois*, Ill. Att'y Gen. Press Release (Mar. 26, 2007), https://www.illinoisattorneygeneral.gov/pressroom/2007_03/20070326b.html [https://perma.cc/KY9A-Z5FE]. The Attorney General noted that foreclosure filings statewide jumped 55% in 2006, totaling 72,455, and that those numbers were expected to spike even higher. *Id.* She recognized the critical need for "everyone with a stake in the problem—state and local government, lenders, regulators, and housing advocates—[to] come together *now* to implement solutions." (Emphasis in original.) *Id.*

¶ 67　　　Among the many solutions were efforts to stem the foreclosure crisis in the courtroom. As an indicator of the seriousness of the crisis, the Attorney General noted that the Cook County circuit court had reported a "a more than 50 percent increase in foreclosure filings in the first two months of 2007." *Id.* At that rate, the court was on track to handle a record 33,000 foreclosure cases that year. *Id.*; see also Cook County Cir. Ct. Gen. Admin. Order 2010-01 (Apr. 8, 2010), http://www.cookcountycourt.org/Portals/0/Chancery%20Division/General%20Administrative%20Orders/GO%2010-01.pdf [https://perma.cc/33DJ-N9T4] (noting that filings increased from 16,494 in 2005 to 47,049 in 2009). By 2012, an astronomical 78,000 cases were pending in Cook County, where 11 judges were assigned to hear mortgage foreclosure cases. Maria Kantzavelos, *Housing Crisis Intervention: Foreclosure Mediation in Illinois*, 100 Ill. B.J. 296, 297 (2012). Efforts were being taken to address a "drastic increase in mortgage foreclosure cases and the resultant burden on judicial circuits throughout the state." See Ill. S. Ct. R. 99.1, Committee Comments (adopted Mar. 1, 2013). The burden on the court system was evident—one foreclosure could impose up to $34,000 in direct costs on local government, including court actions. William C. Apgar, Mark Duda, and Rochelle Nawrocki Gorey, Homeownership Preservation Foundation, *The Municipal Cost of Foreclosures: A Chicago Case Study*, at 2 (Feb. 27, 2005), https://www.issuelab.org/resources/1772/1772.pdf [https://perma.cc/T6LG-LGH5].

¶ 68　　In the wake of the crisis, the mortgage foreclosure article of the Code of Civil Procedure was amended to provide that, with respect to residential real estate, a lender filing a foreclosure complaint shall pay the clerk of the court a $50 fee for deposit into the Foreclosure Prevention Program Fund. 735 ILCS 5/15-1504.1(a) (West 2014). Under that provision, the clerk of the court retains 2% of the fee and remits the remainder to the state treasurer exclusively for the Foreclosure Prevention Program Fund. *Id.* Notably, this funding mechanism was specifically negotiated directly with the financial institutions that would be paying the fee in most cases. See 96th Ill. Gen. Assem., House Proceedings, May 7, 2010, at 21 (statements of Representative Lyons) ("This $50 fee was language that was given to us by the financial institution[s].").

¶ 69　　In 2013, section 15-1504.1 was amended. See Pub. Act 97-1164, § 15 (eff. June 1, 2013); Pub. Act 98-20, § 15 (eff. June 1, 2013). The amendments included an added fee for foreclosure filings based on a sliding scale depending on the number of foreclosure complaints filed by the lender in the prior year. 735 ILCS 5/15-1504.1(a-5) (West 2014). The revenue from the fee is deposited into the Foreclosure Prevention Program Graduated Fund and the Abandoned Residential Property Municipality Relief Fund. *Id.* This provision is currently scheduled to sunset in 2023. 735 ILCS 1504.1(a-5)(1) (West Supp. 2019) (amended by Pub. Act 101-10, § 50-25 (eff. June 5, 2019)).

¶ 70　　During the third reading of the amendatory bill in the House of Representatives, Representative Zalewski sought to specifically address the intent of the proposed legislation and its relation to the court system:

　　"Foreclosures and abandoned properties create huge problems for neighborhoods and for local government. It seems like foreclosures and vacant properties also *place huge burdens on our courts*. These properties have lots of foreclosure violations that local governments try to address in court, an abandoned property to check the legal activity *and those cases wind up in court*. And if the properties don't get cleaned up, then surrounding property values go down and you wind up with more vacant properties, more code violations, more crime and even *greater burden on the courts*. It is the intention of this Bill to reverse this cycle to get money to local governments to help clean up these properties which will then reduce the volume of cases that the courts need to

handle and allow courts to operate more efficiently?" (Emphases added.) 97th Ill. Gen. Assem., House Proceedings, Dec. 4, 2012, at 32 (statements of Representative Zalewski).

¶ 71    Representative Lyons, one of the bill's sponsors, responded, "Yes, Representative Zalewski, that's the intent of this legislation." *Id.* (statements of Representative Lyons).

¶ 72    With respect to the Foreclosure Prevention Program Fund and its grants for housing counseling, Representative Zalewski further inquired about their relationship to the court system:

> "And it seems to me that the money this Bill will provide for housing counseling won't just help homeowners, *it will also help the courts*. We know that housing counseling helps people find alternatives to foreclosure and that means that housing counseling will reduce the number of foreclosure cases that are *burdening our court system*. Is it an intention of this Bill to create funding for housing counseling in order to reduce the number of foreclosure cases which burden the system… the court system in the state and therefore, *help the courts* deal more efficiently with the huge volume of foreclosure cases?" (Emphasis added.) *Id.* at 32-33 (statements of Representative Zalewski).

¶ 73    Representative Lyons responded, "Yes. Again, Representative Zalewski, that is the intention of this legislation." *Id.* at 33 (statements of Representative Lyons).

¶ 74    As part of this same amendatory act, the General Assembly added express findings in the mortgage foreclosure article directly related to both the Foreclosure Prevention Program Fund and the Abandoned Residential Property Fund. 735 ILCS 5/15-1108 (West 2014). The General Assembly found that "housing counseling has proven to be an effective way to help many homeowners find alternatives to foreclosure." *Id.* Accordingly, it reasoned that such counseling—provided by the Foreclosure Prevention Program—would "reduce[ ] the volume of matters which burden the court system in this State and allow[ ] the courts to more efficiently handle the burden of foreclosure cases." *Id.*

¶ 75    With respect to abandoned property, the General Assembly specifically found that "residential mortgage foreclosures and the abandoned properties that

sometimes follow create enormous challenges for *** the courts" by "reducing neighboring property values, reducing the tax base, increasing crime, [and] placing neighbors at greater risk of foreclosure." *Id.* Thus, it concluded that "maintaining and securing abandoned properties" through the Abandoned Property Fund would reduce these negative effects and "mak[e] a substantial contribution to the operation and maintenance of the courts of this State by reducing the volume of matters which burden the court system." *Id.*

¶ 76     When later debating whether to extend the amendment beyond its initial sunset date, the legislators again acknowledged that, when this legislation was initially implemented, "there was a tsunami of foreclosures" and that the General Assembly took measures, "working with the financial services industry, to try to remediate the problems associated with that." 100th Ill. Gen. Assem., Senate Proceedings, May 2, 2017, at 60 (statements of Senator Nybo).

¶ 77     Viewed in the context of the legislative history and the express findings of the General Assembly, this case is wholly distinguishable from *Crocker*, upon which the majority relies. In *Crocker*, this court found a charge imposed on divorce litigants to support domestic violence shelters violated the free access clause because there the charges were too remote from any court-related purpose. *Crocker*, 99 Ill. 2d at 455.

¶ 78     Unlike the situation in *Crocker*, here, the General Assembly has made it clear that section 15-1504.1(a) and (a-5) were intended to effectuate a legitimate legislative purpose of dealing directly with a foreclosure crisis in the courts. These provisions were negotiated with the banks, and subsection (a-5) has a sunset provision. It is entirely rational to conclude that the charges here are imposed for a court-related purpose and that there is a reasonable, nonarbitrary relationship between the purpose of the charges—improving the administration of the courts in a time of crisis—and the means adopted to achieve that purpose, imposing the charge on parties initiating residential foreclosure litigation.

¶ 79     That the legislature chose this particular means of attempting to tackle the court crisis is not the court's concern. It is enough that these programs, just as those in *Wenger*, *Mellon*, and *Rose*, were intended to reduce court backlog resulting from the foreclosure crisis and conserve court resources, improving the overall operation of the court system. The connection to the operation and maintenance of the court

system was demonstrably apparent to the legislature. See *In re J.W.*, 204 Ill. 2d 50, 72 (2003) ("If there is any conceivable basis for finding a rational relationship, the statute will be upheld."). For this court to hold that the foreclosure charges are too remote to be reasonably related to the maintenance and operation of the court system flies in the face of the express legislative findings and declaration of the General Assembly. The majority's view is, at a minimum, contrary to its own acknowledged requirement that we must resolve any doubts in favor of the statute's validity. *People v. Rizzo*, 2016 IL 118599, ¶ 23.

¶ 80        When examined in the proper context and under the appropriate legal standards, it is more than reasonably possible to uphold the constitutionality of section 15-1504.1 under the free exercise clause. The majority's reasoning is as faulty as it is conclusory. I respectfully dissent from this untenable and unprecedented departure from our traditional notions of rational basis review.

¶ 81        JUSTICE NEVILLE took no part in the consideration or decision of this case.