2023 IL App (4th) 220643
NOS. 4-22-0643, 4-22-0645 cons.

FILED
July 14, 2023
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| FIRST MIDWEST BANK, Administrator of the Estate of Cynthia Overstreet, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant and Cross-Appellee, | ) | Winnebago County |
| v. | ) | No. 12L58. |
| THOMAS ROSSI, M.D., and THE PEORIA SURGICAL GROUP, LTD., | ) ) | Honorable |
| Defendants-Appellees and Cross-Appellant. | ) ) | Donna R. Honzel, Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice DeArmond and Justice Harris concurred in the judgment
and opinion.

**OPINION**

¶ 1        In October 2007, defendant, Thomas Rossi, M.D., performed gastric bypass
surgery on Cynthia Overstreet (Cindy). In March 2021, plaintiff, First Midwest Bank, as
Administrator of the Estate of Cynthia Overstreet (the Estate), filed a complaint for negligence
against Rossi. The complaint also named as defendant the Peoria Surgical Group, Ltd., of which
Rossi was a member, based upon a claim of vicarious liability. (Hereinafter, we refer to the
defendants collectively as "Rossi.") In addition to other damages requested, the complaint
requested damages for Cindy's disfigurement and for loss of society to Cindy's son, Anthony
Fry (Tony).

¶ 2        The complaint alleged, among other things, that, as part of the postoperative
treatment, Rossi prescribed Cindy various nutritional supplements, including a vitamin

B-complex supplement. Following the surgery, Cindy complained of vomiting and nausea and was hospitalized in December 2007 with neurological symptoms.

¶ 3         Several days after being hospitalized, Cindy went into a coma from which she never recovered. She died seven years later in 2014. The undisputed cause of Cindy's coma and death was Wernicke's encephalopathy (Wernicke's)—a condition resulting from vitamin B-1 (thiamine) deficiency that causes swelling in the brain.

¶ 4         In September 2021, a jury found Rossi liable for negligence and awarded the Estate damages for (1) lost wages, (2) medical bills, (3) loss of a normal life, and (4) grief, sorrow, and mental suffering. The jury did not award any damages for Tony's loss of society, and the trial court did not instruct the jury that it could award damages based upon Cindy's disfigurement.

¶ 5         The parties filed multiple posttrial motions. Ultimately, the trial court (1) reduced the Estate's damage award for medical expenses written off by health care providers, pursuant to section 2-1205 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1205 (West 2020)), (2) granted the Estate prejudgment interest on the damages, pursuant to section 2-1303(c) of the Code (*id.* § 2-1303(c) (West Supp. 2021)), and (3) denied the parties' motions for new trial. The parties filed cross appeals.

¶ 6         The Estate appeals, arguing as follows:

¶ 7         First, the Estate argues that the trial court erred by failing to instruct the jury on disfigurement. Specifically, the Estate asserts the court erroneously concluded that evidence of awareness was required for an instruction on disfigurement to be given. Because we agree with the trial court's analysis and conclusion, we affirm the trial court's decision.

¶ 8       Second, the Estate argues that because the jury's failure to award damages to Tony for loss of society was against the manifest weight of the evidence, the trial court erred by denying the Estate's motion for new trial. We disagree and affirm the trial court's decision.

¶ 9       Third, the Estate argues that the trial court erred by reducing the judgment under section 2-1205 of the Code because medical expenses that had been written off by the health care providers did not qualify for reduction. We agree with the Estate and reverse the trial court's decision.

¶ 10      Rossi cross-appeals and argues the following:

¶ 11      First, Rossi argues that the trial court erred by denying his motion for a new trial in which he alleged he was unfairly prejudiced by what he claims was the admission of lay testimony regarding the standard of care. Specifically, Rossi contends that the Estate presented prejudicial testimony from Cindy's sister regarding a medical article that she found online about Wernicke's, which, in part, resulted in Cindy's being treated for Wernicke's. Because the record shows that testimony did not prejudice Rossi, we affirm the trial court's decision denying Rossi's motion for new trial.

¶ 12      Second, Rossi argues that the award of prejudgment interest should be vacated as unconstitutional. In particular, Rossi contends that the prejudgment interest statute (*id.* § 2-1303) is unconstitutional because it (1) interferes with the fundamental right to a trial by jury and the jury's determination of damages, (2) violates due process by providing for double recovery and interfering with vested rights, (3) constitutes impermissible special legislation under the Illinois Constitution, (4) violates equal protection, and (5) was passed in violation of the three-readings rule. We disagree and affirm the award of prejudgment interest.

¶ 13      Accordingly, we affirm in part, reverse in part, and remand with directions that the trial court reduce the judgment pursuant to section 2-1205 of the Code consistent with this opinion.

¶ 14                                    I. BACKGROUND

¶ 15                                   A. The Complaint

¶ 16      In March 2014, the Estate filed its initial complaint with the trial court, which it amended multiple times before trial. The Estate's amended complaint alleged negligence against Rossi on behalf of (1) the Estate and (2) Cindy's son Tony, under the Wrongful Death Act (740 ILCS 180/2 (West 2020)). Those counts included claims for Cindy's disfigurement and Tony's loss of society.

¶ 17      The complaint alleged generally that Rossi, a bariatric surgeon, breached his duty of care to Cindy by failing to identify and treat Cindy's thiamine deficiency, causing her to become comatose. Specifically, the complaint alleged that the standard of care for a bariatric surgeon in 2007 required Rossi (1) to know the risk of thiamine deficiency and Wernicke's following bariatric surgery, (2) to administer intravenous thiamine rather than thiamine pills while Cindy was experiencing chronic nausea and vomiting, and (3) to coordinate care of Cindy with doctors at OSF St. Anthony Medical Center in Rockford, Illinois (OSF Rockford)—the city where Cindy resided. (We note that the original complaint also named other defendants in addition to Rossi, but those allegations were dismissed in April 2019 after settlement.)

¶ 18                                     B. The Trial

¶ 19      In September 2021, the trial court conducted a jury trial.

¶ 20                              1. *General Summary of Events*

¶ 21        The evidence presented at trial generally shows that on October 11, 2007, Rossi performed gastric bypass surgery on Cindy at OSF St. Francis Medical Center (OSF Peoria), located in Peoria, Illinois, reducing the size of her stomach from "over a couple hundred ounces" to "about an ounce and a half." Because the surgery reduced Cindy's ability to consume food and absorb nutrients, Rossi prescribed Cindy oral vitamins to guard against vitamin deficiencies. One of the supplements he prescribed was a supplement of B-complex vitamins containing thiamine.

¶ 22        On October 31, 2007, Cindy called Rossi to tell him that she was experiencing nausea and vomiting that caused her to have difficulty eating and drinking.

¶ 23        On November 4, 2007, Cindy was admitted to the emergency room at OSF Rockford, complaining of nausea and vomiting. She was released to go home that same day.

¶ 24        On November 6, 2007, following an office visit in Peoria with Rossi, Cindy was admitted to OSF Peoria for dehydration. She was later released that same day. From November 9, 2007, through November 13, 2007, Cindy was again hospitalized at OSF Peoria for nausea and vomiting.

¶ 25        On November 20, 2007, Cindy visited her primary care physician in Rockford, who recommended that if her vomiting continued, she should go to the emergency room. Three days later, on November 23, 2007, Cindy went to the OSF Rockford emergency room, complaining of nausea and vomiting. Cindy was admitted to the hospital for nine days and released on December 3, 2007.

¶ 26        On December 7, 2007, and December 10, 2007, Cindy called Rossi's office to report that she was suffering from nausea and dry heaves. On December 11, 2007, Cindy's mother drove Cindy to Rossi's office in Peoria because Cindy's symptoms continued to worsen.

That same day, Rossi admitted Cindy to OSF Peoria, where she remained until she was discharged on December 13, 2007.

¶ 27 On December 20, 2007, Cindy's mother called Rossi's office to report that (1) Cindy had "altered consciousness" and could barely walk and (2) they were headed to the emergency room at OSF Rockford. Cindy was admitted that same day. By December 24, 2007, Cindy became comatose and remained in that state until her death in 2014.

¶ 28 Even though Cindy received intravenous fluids during her multiple visits to OSF Peoria, Rossi prescribed Cindy only oral vitamins and never administered intravenous thiamine throughout Cindy's postoperative care.

¶ 29 After Cindy went into a coma at OSF Rockford, her sister, Sandy Tyman, on December 27, 2007, found online an article titled, "Wernicke's Encephalopathy in a Patient After Gastric Bypass Surgery," which Cindy's mother later presented to physicians at OSF Rockford. After receiving the article, the physicians began treating Cindy with intravenous thiamine.

¶ 30 Nonetheless, Cindy never awakened from her coma, dying seven years later in July 2014, at the age of 37. Cindy was survived by Tony, who was 22 years old at the time of trial in September 2021. The parties do not dispute that the cause of Cindy's death was Wernicke's. The parties also do not dispute that if Cindy been treated with intravenous thiamine while she was still conscious, she would not have become comatose.

¶ 31 2. *The Evidence and Trial Proceedings Related to the Standard of Care*

¶ 32 a. Rossi's Motion in *Limine*

¶ 33 During trial, Rossi moved to bar the Estate from eliciting any medical testimony from lay witnesses, which the trial court granted without objection. Soon after, Rossi learned that

the Estate intended to elicit testimony from Tyman regarding the article she found online, and Rossi moved to bar that testimony because it would imply that if a lay person could easily discover the article, then Rossi should have been aware of the article, given his education and expertise. (We note that the inclusion of testimony from Cindy's sister and mother in this section is not meant to imply our agreement with Rossi regarding whether the evidence of the article went towards the standard of care. Accordingly, we set out those portions of lay testimony in this section solely to place it in the context in which Rossi frames it in his argument on appeal.)

¶ 34        The Estate responded that it intended to introduce evidence of the article through expert testimony and medical records. The Estate also argued that Tyman's finding the article showed only that the article was available online in 2007 to both laypersons and bariatric surgeons. Over Rossi's objection, the trial court allowed Tyman and her mother to testify about the name of the article and how it was found.

¶ 35                              b. Sandy Tyman

¶ 36        Tyman testified that Cindy was her youngest sister. Tyman also stated that Cindy had one child—Tony—and her parents were John and Carolyn Overstreet. In 2007, Tyman was employed as a preschool teacher.

¶ 37        Tyman testified that she visited Cindy at OSF Rockford shortly after Christmas and was confused about why Cindy was in a coma. Tyman then went home and did an online search "about coma and gastric bypass to see if [she] could find something that made what was going on with [Cindy] make sense." Regarding the results of that search, Tyman testified that she found one article, titled "Wernicke's Encephalopathy in a Patient After Gastric Bypass Surgery," that "sounded familiar from what [she] knew about Cindy's condition." Tyman emailed the article to her parents.

¶ 38                                    c. Dr. Thomas Rossi

¶ 39         Rossi testified as an adverse witness that he was the surgeon primarily responsible for Cindy during her surgery and postoperative care. He explained that prior to surgery, bariatric patients had to attend a class in which they would be presented with information regarding nutrition and potential complications of the surgery. Rossi testified that, in 2007, Cindy would have viewed a PowerPoint presentation that he had approved. The Estate published copies of some of the slides from that presentation, including a slide related to vitamin B-complex deficiencies. Rossi acknowledged that the slide provided a warning that if a patient experienced prolonged vomiting after surgery, she could become thiamine deficient.

¶ 40         Rossi testified that Cindy's mother, Carolyn, called his office on December 20, 2007, which was the first time anyone other than Cindy had called Rossi's office. Carolyn reported to office staff that Cindy had an "altered level of consciousness" and could barely walk. At that time, office staff interrupted Rossi while he was performing surgery on another patient to alert him of Cindy's condition. Rossi could not recall if he did any research at that time regarding Cindy's reported symptoms.

¶ 41         Rossi testified that the next day, December 21, 2007, Carolyn called the office again and reported that (1) Cindy had been admitted to OSF Rockford and (2) OSF Rockford doctors were not very familiar with bariatric surgery because OSF Rockford did not have a bariatric program. After speaking with Carolyn, Rossi did not conduct any research into Cindy's symptoms but told Carolyn that Cindy needed to see a neurologist. Later that same day, Rossi spoke with the admitting physician at OSF Rockford by phone and learned that Cindy had an "altered level of consciousness," difficulty walking, and vision problems. Rossi did not know the

cause of her condition and did not do any research. However, he told the physician that Cindy needed to see a neurologist.

¶ 42    Rossi did not hear from Cindy or Carolyn again until December 26, 2007, when Carolyn called Rossi's office. Carolyn told Rossi that Cindy was in a coma. Carolyn further said that she needed "to talk to somebody before they start a feeding tube on Cindy." During that week, Rossi did not do any research into the potential cause of Cindy's condition. Rossi did not know at that time about Wernicke's but learned of it at some point "probably after the 26th" when he was informed that Cindy was being treated with thiamine.

¶ 43    Without objection, the Estate then read to Rossi a progress note from Dr. Gary Rifkin, a treating physician at OSF Rockford, dated December 28, 2007. The note stated the following: "Family found articles of gastric bypass with post-op vomiting, leading to Wernicke's encephalopathy, which was in our differential, but the clinical findings didn't seem to fit. I was unaware of the association with bypass gastrectomy. Have started thiamine." The Estate asked Rossi whether OSF Rockford's diagnosis of Wernicke's was based at least in part on the article that Tyman found. Rossi agreed and testified that the article was a case report in a publication prior to 2007.

¶ 44    The Estate asked Rossi whether "that article was found by a preschool teacher," Rossi's counsel objected, and the trial court sustained the objection. Counsel restated the question as follows: "Do you remember that Sandy Tyman was a preschool teacher at the time she did her search?" Rossi responded in the negative without objection.

¶ 45    Rossi testified that he was aware in 2007 that "thiamine was one of the replacements of the B Complex vitamins" and he would have learned in medical school about

Wernicke's. He also learned in medical school that the cause of Wernicke's was a thiamine deficiency but did not learn all the symptoms of Wernicke's at that time.

¶ 46    After Cindy was admitted to OSF Rockford on December 20, 2007, Rossi did not believe he could order the physicians at OSF Rockford to do anything, but he did believe that he could discuss treatment with them. Rossi acknowledged that he did not offer to transfer Cindy to OSF Peoria. He also testified that if he had known what was causing Cindy's condition, he would have called OSF Rockford and recommended that she receive immediate intravenous thiamine.

¶ 47    The Estate asked Rossi whether "in 2007, it was the standard of care for bariatric surgeons to be prepared to manage patients who have uncontrolled vomiting so that such complications as Wernicke's either do not develop or are recognized and treated as early as possible before serious and irreversible injury occurs." The following exchange followed, beginning with Rossi's response to a question he was asked:

> "[ROSSI]: As a point of fact, you should be treating the nausea and the vomiting, [that is] correct.
>
> [THE ESTATE'S COUNSEL]: To prevent those serious complications such as Wernicke's, true?
>
> [ROSSI]: To prevent all sorts of problems. But, yes, everything included.
>
> [THE ESTATE'S COUNSEL]: Including Wernicke's?
>
> [ROSSI]: Including thiamine deficiency, yes.
>
> [THE ESTATE'S COUNSEL]: And Wernicke's?
>
> [ROSSI]: Wernicke's is a side effect at the end.

[THE ESTATE'S COUNSEL]: Wernicke's is a side effect of thiamine deficiency sort of at the end of the thiamine deficiency, is what you were saying?

[ROSSI]: Correct."

¶ 48    Rossi testified that in October 2007, surgeons who treated severe obesity did not need to be aware of Wernicke's as a complication of bariatric surgery. However, Rossi acknowledged an article written in 1988 by Doctor Edward Mason, who Rossi agreed was an authority in the field of bariatric surgery, provided the following, which the Estate read for Rossi: "For a patient who reports vomiting, a distinction must be made between episodic improper eating and uncontrolled starvation. Three types of starvation injury are described: *** [one of which is] Wernicke-Korsakoff syndrome. *** Surgeons who treat severe obesity should be aware of these complications."

¶ 49    The Estate asked Rossi whether "as of October 11th of 2007, a history of uncontrollable vomiting is an early warning sign that opens a window of opportunity for prevention of Wernicke's encephalopathy." Rossi replied, "That early on, I would say, no, it doesn't happen within the first two days of surgery."

¶ 50    The Estate again read from the article, which stated the following: "For obesity surgeons, a history of uncontrollable vomiting is the early warning sign that opens a window of opportunity for prevention [of Wernicke's]." Rossi agreed that "[i]f it's uncontrolled, correct," but countered, "[H]e never had an indication of uncontrolled vomiting in [Cindy's] case."

¶ 51                        d. Dr. Constantine Frantzides

¶ 52    The Estate called Dr. Constantine Frantzides as an expert witness, who testified that he was a "general surgeon, as well as a laparoscopic surgeon or minimally invasive surgery surgeon." Frantzides opined that Rossi was "negligent to the fact that the patient postoperatively

- 11 -

had symptoms and signs of nausea and vomiting, and [Rossi] didn't take the steps necessary to avoid deficiencies."

¶ 53        The Estate asked Frantzides what the standard of care was in 2007 for the treatment of a patient like Cindy who was experiencing "persistent nausea and vomiting starting six weeks after gastric bypass surgery." Frantzides responded as follow:

> "[T]he patient should have been seen, and tests should have been done for the vitamins. It is important, and it has been established even in 2007 that patients after gastric bypass can have vitamin deficiencies. And even if you give them vitamins by mouth, that's not enough because if they have nausea or vomiting, they won't take the amounts that they are required so they don't have deficiencies. And it was known that thiamine deficiency was the most horrible thing that can happen to a patient after a gastric bypass."

¶ 54        When asked whether the "standard of care in 2007 for a bariatric surgeon [was] to know that thiamine deficiency was a risk in gastric bypass patients with prolonged nausea and vomiting," Frantzides responded, "Absolutely."

¶ 55        Frantzides further testified that the standard of care generally was to (1) investigate and treat nausea and vomiting and (2) prevent vitamin deficiencies while those steps were being taken. Vomiting contributed to vitamin deficiencies, and it was important to know "the side effects and the consequences of thiamine deficiency. That's [a] very important thing because the patient may be compliant and take the vitamin; but then if he or she throws up, it's gone."

¶ 56        On cross-examination, Frantzides testified that he had never authored any articles on thiamine or Wernicke's in a post-bariatric patient or treated it in his own practice. He further

- 12 -

acknowledged that (1) "as of 2007 there were no protocols that dictated how a post-bariatric patient was to be managed" and (2) in his deposition he said that vomiting, by itself, was not evidence of a thiamine deficiency, clarifying, "That's why testing has to be done."

¶ 57        Frantzides further testified he did not read the article that Tyman found but knew that it was written in 2005 and found it on the internet. Rossi's counsel inquired into the contents of the article, but the Estate objected on the grounds that it was not declared authoritative; the trial court sustained the objection. Frantzides testified that all physicians would have had access in 2007 to PubMed, a medical literature database, so they could find information related to the illness.

¶ 58        On redirect examination, Frantzides testified that Rossi had the responsibility to "follow the patient closely, evaluate the status of the patient by blood testing, okay, the vitamins, the complete metabolic panel, the [complete blood count], the differential, all these kind of things are important for this kind of patients, that they have this kind of chronic situation ***, that they are having nausea and vomiting, and they cannot take enough nutrition."

¶ 59                        e. Carolyn Overstreet

¶ 60        Carolyn testified that Tyman had sent her an email with the article about Wernicke's attached. After Carolyn received the article, she took it to OSF Rockford and handed it to one of the nurses who was caring for Cindy. The nurse appeared shocked after reading the article.

¶ 61            f. The Discussion with the Trial Court Regarding the Article

¶ 62        Following a recess and outside the presence of the jury, the parties discussed with the trial court the presentation of witness testimony for the next day. Regarding the testimony of

Carolyn, Rossi asked that he be permitted to cross-examine Carolyn regarding the article that Tyman found. Specifically, Rossi wanted Carolyn to acknowledge that the article stated that nutritional deficiencies were not one of the common consequences or complications of bariatric surgery. The trial court observed that "[the Estate] has made a big deal about this article, like it's some sort of a smoking gun," and added, "the manner in which [the Estate] has presented this article and the way it's been done has given an implication that it would be unfair not to allow some fashion of rebuttal from [the] defense." However, the trial court did not at that time make its ruling regarding the issue.

¶ 63    The following day, outside the presence of the jury, the trial court raised the issue of lay testimony and concluded that the testimony about the article did not serve any legitimate purpose, likening the implication of the article to a GEICO Insurance television commercial— namely, "so easy a cave man could do it." The court continued, "There certainly was an implication that it's so easy to find the article, a preschool teacher could find it."

¶ 64    In an attempt to cure the perceived impropriety, the trial court told the parties it would instruct the jury "to disregard the testimony presented by Sandy Tyman and Carolyn Overstreet about any research conducted, article found, or what was done with or observed regarding the article, because that testimony is not evidence."

¶ 65    Rossi moved for a mistrial, which the trial court denied.

¶ 66    The trial court later instructed the jury to disregard testimony about the article, admonishing the jury as follows:

> "When instructed to disregard testimony or when instructed that testimony has been stricken, it is your duty to follow my instructions. It would be unfair to the parties and a violation of your oath to not follow my instructions.

At this time, in keeping with that, I'm instructing you to disregard all testimony presented by Sandy Tyman and Carolyn Overstreet about any research conducted, article found, or what was done with or observed regarding the article. That testimony is not evidence."

¶ 67                                          g. Dr. Keith Millikan

¶ 68           Dr. Keith Millikan, Rossi's expert, testified that he was a "general academic surgeon" at Rush University in Chicago. Millikan testified that there is not necessarily any protocol or mandate governing the standard of care for handling postoperative bariatric patients. However, Millikan testified that the standard of care did not require Rossi to order thiamine testing or supplementation in response to Cindy's complaints of nausea and vomiting on October 31, 2007.

¶ 69           Millikan asserted that thiamine testing is not warranted when no other symptoms are present and the patient exhibits only nausea. Millikan testified that such testing by Rossi was especially not warranted when nutritionists and dieticians had no indication that vitamins were not being absorbed. A reasonably competent bariatric surgeon would take into account input from nutritionists. Regarding interacting with OSF Rockford physicians, "[t]he best [Rossi] could do would be to speak to them and answer any questions that they had."

¶ 70           On cross-examination, Millikan testified that he had attended multiple surgical conferences between 1990 and 2010 and thiamine deficiency was never mentioned at those conferences as a possible nutritional deficiency. However, when the Estate confronted Millikan with his deposition testimony that Wernicke's was discussed as a vitamin B12 complication, Millikan testified that he "misspoke" in the deposition because it was not a B12 complication. Millikan acknowledged that in the deposition he stated Wernicke's was not linked to thiamine

- 15 -

deficiency until 2010. Millikan maintained that Wernicke's had causes other than thiamine deficiency, such as alcoholism. However, he did not know how alcoholism caused Wernicke's, stating he would have to ask a neurologist about the mechanism.

¶ 71        When asked multiple times whether thiamine was appropriate to administer for alcoholics to prevent Wernicke's, Millikin answered repeatedly that he would have to consult a neurologist or dietician. When asked whether he knew at that moment that thiamine deficiency was discovered to be the cause Wernicke's in the 1930's, he stated, "Oh, I do know that."

¶ 72        Millikan testified that bariatric surgeons should know the content of presentations that their patients are required to attend before surgery. The Estate then showed Millikan the PowerPoint slides that (1) Cindy viewed as part of her preparation for bariatric surgery and (2) Rossi had approved should be shown to his patients prior to bariatric surgery. The Estate asked Millikan, based on the slides, whether Rossi should have known that thiamine deficiency was a risk that could result from bariatric surgery. Millikan replied, "Yes." However, when asked whether vomiting and neurological symptoms would suggest Wernicke's, Millikan said he had no opinion.

¶ 73        When the Estate asked Millikan if he "agree[d] that the standard of care in 2007 required a bariatric surgeon to be aware that Wernicke's encephalopathy was a risk of bariatric surgery," Millikan responded, "Not necessarily." The Estate then impeached Millikan with his deposition testimony in which he agreed that "[i]t was the standard of care in 2007 for a bariatric surgeon to be aware that Wernicke's encephalopathy was a risk of bariatric surgery."

¶ 74                          3. *The Disfigurement Evidence*

¶ 75        As evidence of Cindy's disfigurement, the Estate presented, among other things, (1) Cindy's medical records, (2) a video depicting Cindy's comatose state, and (3) testimony

- 16 -

from Dr. Paul Wang, who was Cindy's physician at the long-term care facility in Rock Island in which Cindy received care while in her coma. In May 2008, Wang observed "contractures" and "decorticate posturing" during an examination. Wang explained that contractures are a tightening of the muscles, tendons, and tissues that causes the joints to shorten and become very stiff and difficult to move. He described decorticate posturing as abnormal posturing in which the person is stiff with the arms pulled up and flexed, fists clenched, legs extended or held out straight, and muscles contracted, rigid and tight.

¶ 76 Wang testified that the contractures and the decorticate posturing were caused by Cindy's brain injury and that they were permanent conditions. In addition to being described by Wang and documented in the medical records, Cindy's contractures and decorticate posturing were shown to the jury as part of a "day in the life" video that was admitted into evidence.

¶ 77 4. *The Evidence of Loss of Society*

¶ 78 As an initial matter, we note that Tony did not testify at trial. Instead, evidence of Tony's loss of society was presented by members of his family, including his grandmother, aunt, and Dr. Louis Kraus, a psychiatrist.

¶ 79 The family generally testified about their impressions that Cindy had enjoyed a loving relationship with her son. Tony would spend time with Cindy, including camping, fishing, playing T-ball, bike riding, visiting amusement parks, trick-or-treating, and attending church. Prior to Cindy's death, Tony never acted aggressively towards anyone and was doing well in school. However, once Cindy went into a coma, his behavior became worse, and he seemed to lose interest in school. The year after Cindy died, Tony was admitted for 10 days to Streamwood Behavioral Health for suicidal thoughts and self-mutilation.

¶ 80      At the time of the trial, Tony was 22 years old and spent most of his time in his basement bedroom of his grandparents' home. The family testified that Tony did not have a job, friends, or a driver's license and did not join the family for Christmas or holiday parties.

¶ 81      Kraus testified he was an expert in child, adolescent, and forensic psychiatry. Kraus explained that Tony had been diagnosed with several mental health disorders before 2007. School and therapy records showed that Tony had suffered from attention-deficit/hyperactivity disorder (ADHD) since first grade. Kraus agreed with the diagnosis and testified that Tony continued to experience ADHD after his mother's surgery and death. In addition to ADHD, Kraus testified that Tony was diagnosed with two other mental health disorders before Cindy's surgery in 2007—namely, oppositional defiant disorder and adjustment disorder with depression. Further, medical records from before 2007 documented that Tony exhibited anger, an irritable mood, and violent acts such as hitting, kicking, or yelling, for which Tony received behavior management training.

¶ 82      Kraus testified that he examined Tony twice—once when Tony was 17 and the other time when he was 20, which was 5 years after Cindy's death. Kraus concluded that Cindy's death had a significant impact on Tony.

¶ 83                    C. The Jury Instructions and Verdict

¶ 84                    1. *Jury Instruction Discussion*

¶ 85      After the close of evidence, relevant to this appeal, the trial court discussed with the parties jury instructions relating to disfigurement. The following exchange occurred:

"THE COURT: Given. Plaintiff's 17, IPI 31.10. Including 30.04, 30.04.01, 30.05 and 30.06. I'm not sure [about] the disfigurement part.

- 18 -

[ROSSI'S COUNSEL]: So, we would also object, based on the evidence, to the pain and suffering component and also the disfigurement component.

THE COURT: Well, disfigurement, for sure. There is no evidence of disfigurement.

[THE ESTATE'S COUNSEL]: Judge, we respectfully suggest that the video demonstrates profound disfigurement. The posture, the arms and the hands pulled up to the chin, the facial distortions, the tongue, the damage done to this woman's body. You saw the decubitus ulcer that existed for seven years. That is disfigurement.

THE COURT: I don't believe that is what is intended by disfigurement."

¶ 86    In support of its argument that disfigurement instructions should be given to the jury, the Estate then referred the trial court to *Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150, 650 N.E.2d 985 (1995), and explained that "in *Holston*, the court defines disfigurement as mean[ing] to make less complete, perfect or beautiful in appearance or character." Rossi replied that disfigurement required conscious awareness of the victim's physical state and no evidence was presented during the trial that would support a finding that Cindy consciously knew she was disfigured. The court responded that it would research the issue overnight.

¶ 87    The next day, the trial court told the parties it had concluded that evidence of awareness was required for it to tender a disfigurement instruction, explaining, in part, "Historically, as I indicated and I quoted just one case, but I could have quoted dozens and dozens of cases where disfigurement was a line item in questions and evidence—questions were asked, and evidence presented about the consequences to the individual for the personal injury or

- 19 -

disfigurement." The court also recognized that pain and suffering required evidence of consciousness, and it did not believe that Cindy's disfigurement was of the type for which a disfigurement instruction was intended. Ultimately, the court determined that the Estate could still ask the jury to consider the disfigurement "as part of the loss of normal life."

¶ 88                                2. *The Jury's Verdict*

¶ 89        In September 2021, the jury returned a verdict in favor of the Estate, finding that Rossi had acted negligently. The jury awarded damages totaling $7,745,400, as follows: (1) $910,000 for lost wages; (2) $2,335,400 for medical expenses; (3) $2 million for loss of normal life; (4) $0 for pain and suffering; (5) $2.5 million for grief, sorrow, and mental suffering; and (6) $0 for loss of society.

¶ 90                              D. The Posttrial Proceedings

¶ 91                      1. *The Motion for Prejudgment Interest*

¶ 92        In October 2021, the Estate moved to include prejudgment interest in the judgment order filed September 2021, pursuant to section 2-1303(c) of the Code (735 ILCS 5/2-1303(c) (West Supp. 2021)). Rossi objected, arguing, among other things, that section 2-1303 of the Code was unconstitutional. In December 2021, the trial court issued its written order, granting the Estate's motion for prejudgment interest and denying Rossi's constitutional challenge to the prejudgment interest statute.

¶ 93                2. *The Motion for Setoff and Reduction of Judgment*

¶ 94        In January 2022, Rossi moved for a setoff of $4.9 million to account for prior settlements, as well as a reduction of the remaining award pursuant to section 2-1205 of the Code to account for any collateral payments to the Estate. After a $4.9 million reduction for the settlements, the remaining jury verdict was $2,845,400. Because the relevant medical bills for

which medical providers sought no recoupment—namely, $1,662,414.38—was more than half of the remaining verdict, Rossi asserted the proper reduction pursuant to section 2-1205 was $1,422,700. The Estate objected to a portion of this reduction as reflecting amounts "written off" by medical providers, arguing that those sums were not subject to reduction under section 2-1205. We note that the amount shown to have been paid by Cindy's insurance company was $296,069.17.

¶ 95　　　　The trial court granted Rossi's motion, noting that it was bound by the Second District's precedent in *Perkey v. Portes-Jarol*, 2013 IL App (2d) 120470, 1 N.E.3d 5, which the trial court determined allowed for written-off medical expenses to be included in reduction calculations.

¶ 96　　　　　　　　　　　　3. *Rossi's Motion for New Trial*

¶ 97　　　　Later in January 2022, Rossi moved for a new trial, arguing he was denied a fair trial because he was substantially prejudiced by the introduction of the testimony regarding the article. Rossi asserted that the testimony suggested that the standard of care required Rossi to be aware of the article.

¶ 98　　　　The trial court denied the motion, concluding, in part, as follows:

> "[Rossi] acknowledge[s] that the court did instruct the jury, ultimately, to disregard the testimony presented by the sister and mother about any research conducted or what was done with or observed regarding the article because that testimony is not evidence. The jury acknowledged its understanding of the court's instruction. *** Additionally, the jury was instructed with IPI 105.1 that it must rely on expert opinion testimony in determining the standard of care. Both

attorneys in closing arguments discussed the standard of care and the expert testimony regarding the standard of care.

*** 

In addition, the references by the sister and mother's testimony were made on three different days without contemporaneous objection by defendants. *** The issues were not raised in *voir dire*, opening statements or closing arguments. *** [Rossi] did give testimony regarding the sister finding an article and sending it to her mother. He acknowledged the article was in publication and available prior to October 11, 2007. The parties stipulated to medical records and without objection the entry by Dr. Gary Rifkin was read to the jury. ***

*** 

In assessing the record as a whole, the testimony from Sandy Tyman, the sister[,] and Carolyn Overstreet, the mother, was not unduly prejudicial, particularly in light of the instructions and admonition from the court."

¶ 99                                    4. *The Estate's Motion for New Trial*

¶ 100       In January 2022, the Estate moved for a new trial on damages alone, arguing that (1) the jury should have been instructed as to disfigurement and (2) the jury's failure to award damages for Tony's loss of society was not supported by the evidence. In June 2022, the trial court denied the Estate's motion in a written order.

¶ 101       Regarding disfigurement, the trial court found that a disfigurement instruction required evidence of awareness based on caselaw stemming from *Chicago City Ry. Co. v. Smith*, 226 Ill. 178, 80 N.E. 716 (1907). The court wrote the following:

"Other cases where disfigurement is discussed are ones where the plaintiff was impacted in some fashion by the injury. Despite the fact in these cases the term 'awareness' has not been used, the language utilized by the courts and the manner of description in the cases thus far have all addressed what the marring, *i.e.*, disfigurement, has meant to the plaintiff him or herself. As the defendants point out, it is that testimony which is essential so the jury has facts to base an award upon."

The court concluded that the Estate had been free to argue that Cindy's appearance reflected her loss of normal life.

¶ 102          Regarding loss of society, the trial court wrote as follows:

"Notably, Tony Fry himself never appeared in court and never offered any testimony at all. There was a good amount of evidence presented that Tony had intellectual, emotional[,] and behavioral issues as early as his preschool years. *** In the time period of 2003 to 2005, it was reported Tony sometimes acted violently; that he hit, kicked[,] and hurt his mother. *** Dr. Krause testified to ongoing struggles by Tony as an adult. Family members testified to all the things that his mother did for Tony and offered pictures of them at holidays and birthdays. As the court recalls, the majority of the family testimony pertained to efforts by mother Cynthia Overstreet towards Tony and trying to help him as a single parent. Naturally[,] no one could testify from Tony's perspective.

* * *

*** The jury in this matter heard mainly subjective observations from family members as to their impressions of the loss of society they thought Tony

- 23 -

Fry had suffered. The jury was free to assess those impressions and thoughts and accept them wholly, partly[,] or not at all. There is no suggestion the jury failed to follow the instructions given them regarding loss of society or otherwise acted out of passion or prejudice.

* * *

*** The jury heard the evidence and judged it as well as the credibility of the witnesses and ultimately made their decision. The jury could have reasonably concluded that no evidence of what the loss meant to Tony personally was ever offered since he never testified. That decision is not against the manifest weight of the evidence on this topic."

¶ 103 These appeals followed.

¶ 104        II. ANALYSIS

¶ 105 The Estate appeals, arguing that (1) the trial court erred by denying a disfigurement instruction, (2) the jury's failure to award damages for loss of society was against the manifest weight of the evidence, and (3) the court erred by reducing the judgment under section 2-1205 of the Code. Because we agree only with the Estate's third argument, we (1) affirm the trial court's decisions regarding the disfigurement instruction and the jury's decision not to award damages for Tony's loss of society and (2) reverse the trial court's decision to reduce the judgment pursuant to section 2-1205 of the Code regarding written-off medical expenses.

¶ 106 Rossi also appeals, arguing that (1) he was unfairly prejudiced by the admission of what he claims was lay testimony regarding the standard of care and (2) the award of

- 24 -

prejudgment interest should be vacated as unconstitutional. We disagree with both of Rossi's arguments.

¶ 107                                    A. The Estate's Claims

¶ 108                                    1. *Disfigurement Instruction*

¶ 109      The Estate argues that the trial court erred by failing to instruct the jury on disfigurement because (1) awareness is not an element of disfigurement and (2) the Estate otherwise presented sufficient evidence of disfigurement. We disagree.

¶ 110                          a. The Applicable Law and the Standard of Review

¶ 111      In Illinois, the jury in a negligence case may be instructed for disfigurement as a separate element of compensable damages. *Holston*, 165 Ill. 2d at 175; *Simon v. Kaplan*, 321 Ill. App. 203, 52 N.E.2d 832 (1944). The supreme court has defined the term "disfigure" as " 'to make less complete, perfect, or beautiful in appearance or character.' " *Holston*, 165 Ill. 2d at 175 (quoting Webster's Third New International Dictionary 649 (1986)).

¶ 112      Whether to provide a particular pattern jury instruction lies within the sound discretion of the trial court. *Bailey v. Mercy Hospital & Medical Center*, 2021 IL 126748, ¶¶ 41-42, 186 N.E.3d 366. However, whether a plaintiff can recover damages for disfigurement in the absence of the plaintiff's awareness of her disfigurement presents a question of law that we review *de novo*. See *Illinois State Toll Highway Authority v. South Barrington Office Center*, 2016 IL App (1st) 150960, ¶ 32, 58 N.E.3d 703 (the general rule in civil cases is that legal issues are reviewed *de novo*).

¶ 113                              b. The Relevant Background

¶ 114      The record generally shows that in December 2007, Cindy entered into a "persistent vegetative state," and she was not capable of experiencing conscious pain and

suffering. In May 2008, Cindy began to exhibit decorticate posturing—that is "significant rigidity and spasticity of her upper extremities"—which adversely affected her physical appearance. The parties do not dispute that Cindy was unaware of her disfigurement; instead, the parties dispute whether evidence of awareness was a requirement for the jury to receive a disfigurement instruction.

¶ 115                                       c. This Case

¶ 116        The Estate argues that awareness is not an element of disfigurement because (1) the Illinois Supreme Court impliedly rejected that requirement in *Holston*, 165 Ill. 2d at 175, (2) no case holds that awareness is a requirement for disfigurement, (3) Illinois case law shows that the purpose of disfigurement damages is to compensate for the *fact* of disfigurement, instead of its *impact* on the victim (citing *Simon*, 321 Ill. App. 203, and *Fitzgerald v. Davis*, 237 Ill. App. 488, 492 (1925)), (4) any holding otherwise would be contrary to the premise of tort law in Illinois, and (5) the Illinois Pattern Jury Instruction, Civil, for disfigurement does not contain any reference to awareness as an element. We are unpersuaded.

¶ 117        Initially, we note that no party has cited, nor have we found, any authority from any jurisdiction holding that damages for disfigurement can be awarded to a victim who was never consciously aware of her disfigurement. In that regard, we further note that some evidence was presented that the decorticate posturing that Cindy suffered as a result of the coma is a frequent occurrence in victims in Cindy's condition. Yet, we are not aware of any case awarding disfigurement damages for a comatose victim.

¶ 118        *Holston* is the only case the Estate cites in support of its claim that the jury should have been given an instruction on disfigurement, despite Cindy's being comatose. However, *Holston* did not address the awareness requirement for disfigurement. Moreover, both *Simon*,

321 Ill. App. at 211, and *Fitzgerald*, 237 Ill. App. at 492, involved victims who were aware of their disfigurement. And in neither of those cases was the purpose of disfigurement damages discussed.

¶ 119 In *Holston*, the Illinois Supreme Court reviewed, among other issues, the propriety of a jury award for disability and disfigurement when those injuries occurred nearly simultaneously with the victim's losing consciousness and lapsing into a coma. *Holston*, 165 Ill. 2d at 174-75. The supreme court briefly touched upon the issue of disfigurement, stating simply (1) "there was evidence in the record that Holston suffered both disability and disfigurement as a result of the undetected cardiac tamponade" and (2) "the trial court did not err in permitting the jury to consider Holston's disability and disfigurement in making its award of damages." *Id.* at 175.

¶ 120 Importantly, at no point in *Holston* did the court state—or even imply—that awareness was not a requirement for a jury to award damages for disfigurement. Indeed, the supreme court concluded that for "similar reasons" to its discussion regarding pain and suffering, the disability and disfigurement award was not erroneous. *Id.* Given the supreme court's pain and suffering discussion, which focused on the evidence related to the time *before* the victim lapsed into unconsciousness, the court's writing "for similar reasons" means that it was relying on the same *pre-coma* evidence for its disability and disfigurement discussion as it considered for pain and suffering. Accordingly, the court's holding merely reflected the sufficiency of the evidence and not the evidentiary requirements for a disfigurement instruction.

¶ 121 We also note that the Estate conceded in its written motion for a new trial that *Holston* did not address the issue of awareness.

¶ 122       We reiterate that we are aware of no case that has ever approved of awarding disfigurement damages to a comatose victim, and we decline to be the first court to so hold.

¶ 123       In support of our conclusion, we note that compensating irreversible coma victims for disfiguring injuries presents unique circumstances because unlike the conscious victim—who may one day face ridicule, diminished future employment opportunities, altered relationships, and the pain and costs of corrective plastic surgery—the victim who becomes disfigured only after losing consciousness, and later dies without ever regaining consciousness, suffers no similar injuries. In that way, disfigurement is like pain and suffering, requiring the plaintiff to present evidence showing the victim was aware of the disfigurement in order to recover for disfigurement. See *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 89, 885 N.E.2d 396 (2008) ("The plaintiff must present evidence that the injured party was conscious in order to recover for his pain and suffering."). The trial court here summarized this reasoning well, writing, "In a coma situation such as this, there is no impact upon the plaintiff of the changes resulting from being in a coma and essentially brain dead."

¶ 124       We emphasize that cases involving an irreversibly comatose victim, like this case, are different in kind from cases involving other potential victims of disfigurement. That is to say, an irreversibly comatose person who becomes disfigured while comatose and never regains consciousness before death was never and could never be apprised by any of his or her human senses—such as sight, touch, or hearing—of his or her disfiguring injury.

¶ 125       Nonetheless, as in the present case, the irreversibly comatose victim—or her estate—is not without recompense for her inability to enjoy life's pleasures; because no future harm can befall her greater than that which she has already experienced, damages for loss of normal life subsume disfigurement damages for the comatose victim, allowing her to recover

- 28 -

fully. After all, such a victim has inarguably experienced essentially complete loss of normal life when she is rendered incapable of interacting with the world around her. See Illinois Pattern Jury Instructions, Civil, No. 30.04.02 (2011) (hereinafter IPI Civil (2011)) ("When I use the expression 'loss of a normal life', I mean the temporary or permanent diminished ability to enjoy life. This includes a person's inability to pursue the pleasurable aspects of life.").

¶ 126 Accordingly, we conclude that the trial court did not err by declining to instruct the jury on disfigurement under the facts of this case.

¶ 127 2. *Loss of Society*

¶ 128 Next, the Estate argues that (1) the jury's award of zero damages for Tony's loss of society is against the manifest weight of the evidence and (2) the trial court erred by sustaining it. In particular, the Estate contends (1) direct testimony from Tony was not necessary for the jury to award damages for loss of society, (2) the Estate provided sufficient evidence of loss of society, and (3) there is a presumption of substantial loss. The Estate also contends that the court was incorrect as a matter of law when it denied the Estate's motion for a new trial because, the Estate claims, the court believed it could have rejected the loss of society claim because Tony did not testify or explain his perspective. We disagree.

¶ 129 a. The Applicable Law and the Standard of Review

¶ 130 When deciding a motion for a new trial, trial courts, after weighing the evidence, must grant the motion if the verdict is contrary to the manifest weight of the evidence. *Bland v. Q-West, Inc.*, 2023 IL App (2d) 210683, ¶ 10. "A verdict is considered to be against the manifest weight of the evidence only when the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based upon any of the evidence." *Id.* Appellate

courts review a trial court's decision to grant or deny a motion for new trial for abuse of discretion. *Id.*

¶ 131        The Wrongful Death Act provides that "the jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death, including damages for grief, sorrow, and mental suffering, to the surviving spouse and next of kin of such deceased person." 740 ILCS 180/2(a) (West 2020). Those damages are premised upon a rebuttable presumption that the surviving spouse and next of kin would have had a reasonable expectation of benefits from the continuation of the life of the deceased. *Watson v. South Shore Nursing & Rehabilitation Center, LLC*, 2012 IL App (1st) 103730, ¶ 36, 965 N.E.2d 1200.

¶ 132                                          b. This Case

¶ 133        The Estate contends that the trial court denied the Estate's motion for a new trial regarding the loss of society claim solely because Tony did not testify. The Estate claims that this denial, in effect, amounts to the trial court's imposing a *per se* requirement that the victim must testify in order to secure damages for loss of society. However, the Estate mischaracterizes (1) the effect that the presumption of loss of society has on wrongful death proceedings, (2) the trial court's written order denying the Estate's motion for a new trial, and (3) the strength of the Estate's evidence.

¶ 134        Although the Estate correctly asserts that the presumption of pecuniary injury, on its own, is *sufficient* to sustain a verdict awarding substantial damages (*Hall v. Gillins*, 13 Ill. 2d 26, 31 (1958)), that presumption does not *require* the jury to award damages. See 740 ILCS 180/2(a) (West 2020) ("[T]he jury *may* give such damages as they shall deem a fair and just compensation ***." (Emphasis added.)); see also *Flynn v. Vancil*, 41 Ill. 2d 236, 240, 242

N.E.2d 237 (1968) ("Implicit in the right to weigh the presumption is the right to give it no weight at all."). Like all rebuttable presumptions, the presumption of loss merely establishes a *prima facie* case for loss of society; the presumption itself is not evidence. *Cimino v. Sublette*, 2015 IL App (1st) 133373, ¶ 104, 31 N.E.3d 846; *Flynn*, 41 Ill. 2d at 239-40.

¶ 135    Although factually dissimilar to the present case, we find *Flynn* instructive. In *Flynn*, the jury found the defendant liable for negligence but did not award damages for the death of an infant suffering from an incurable congenital physical defect. *Flynn*, 41 Ill. 2d at 237. Because the parties did not dispute either the infant's condition or the defendant's liability, the only question before the supreme court was "whether the presumption of substantial pecuniary loss to lineal kindred in wrongful-death cases is rebuttable so as to warrant a jury verdict finding liability but awarding no damages." *Id.*

¶ 136    Ultimately, the court concluded that the uncontroverted evidence of the infant's poor health could have reasonably allowed the jury to find the presumption rebutted. *Id.* at 238-39. The court reasoned that the jury had the discretion to determine "the quantum of evidence necessary to rebut the presumption" and emphasized that the presumption does not operate to place a "burden on defendant of excluding every possibility of pecuniary loss." *Id.* at 239, 241. Instead, the court noted that "[t]he farthest reaches of the law require only that the presumption be [(1)] considered if there is no evidence on the issue, or [(2)] if there is evidence, that the presumption be weighed by the jury with such evidence." *Id.* at 241.

¶ 137    In other words, the supreme court determined that the jury is to consider *the totality of the evidence* to determine damages for a plaintiff's loss of society. In *Flynn*, the mere fact that the infant had poor health was sufficient to sustain the jury's verdict awarding no

- 31 -

damages under the Wrongful Death Act because that fact was likely seen by the jury as inconsistent with an actual pecuniary loss.

¶ 138　　　　Similarly, in this case, just because Rossi did not present his own expert testimony regarding Tony's loss of society does not mean the jury was required to ignore the evidence it had already heard—namely, as the trial court put it, that "Tony had intellectual, emotional, and behavioral issues as early as his preschool years" and "[c]learly those issues were present well before his mother's surgery."

¶ 139　　　　Further, the trial court did not attribute the jury's lack of a damage award to Tony for loss of society only to the absence of Tony's testimony. Indeed, the court noted in its written order denying the Estate's posttrial motion that the jury had been presented (1) "a good amount of evidence" that Tony had intellectual, emotional, and behavioral issues prior to Cindy's becoming comatose, (2) testimony that Tony's difficulties would have continued regardless of Cindy's surgery and death, and (3) "subjective observations from family members as to their impressions of the loss of society they thought Tony *** had suffered."

¶ 140　　　　The trial court also wrote that the Estate's psychiatric expert, Dr. Krause, testified that "[i]n the time period of 2003 to 2005, it was reported Tony sometimes acted violently; that he hit, kicked, and hurt his mother," and "these difficulties might have been ongoing regardless of his mother's surgery and later death."

¶ 141　　　　Moreover, we agree with the trial court's conclusion that, "[u]ltimately, giving the jury's verdict substantial deference and in light of the fact that a rebuttable presumption is not itself evidence, looking at this record as a whole, this court is unable to conclude that the jury failed to consider a proven element of damages."

¶ 142　　　　We deem the trial court's analysis appropriate.

¶ 143        Likewise, the record provides no indication that the jury's failure to award damages for loss of society was against the manifest weight of the evidence. See *Camelot, Inc. v. Burke Burns & Pinelli, Ltd.*, 2021 IL App (2d) 200208, ¶ 64, 184 N.E.3d 384 ("The credibility of the witnesses is for the trier of fact to determine. *** [T]he trier of fact[ ] is in a superior position to this court to weigh the witnesses' credibility, weigh the evidence, and determine the preponderance thereof."). And even if the jury did take into consideration Tony's failure to testify at trial regarding his loss of society claim, no rule of law prevented the jury, as trier of fact, from doing so.

¶ 144        We note that we are not the first court to affirm a damage award of $0 in damages to the child of a decedent for loss of society. See *Chrysler v. Darnall*, 238 Ill. App. 3d 673, 680, 606 N.E.2d 553 (1992) ("Regarding plaintiff's argument that decedent's daughter *** was wrongly denied pecuniary damages, we similarly find no error."). We further note that, unlike this case, the daughter in *Chrysler* testified at trial about her relationship with her father. *Id.* at 678.

¶ 145        Accordingly, we conclude that (1) on this record, the jury's award of $0 for loss of society was not unreasonable or arbitrary and (2) as a result, the trial court did not abuse its discretion by denying the Estate's motion for a new trial.

¶ 146                          3. *Reducing the Judgment*

¶ 147        Last, the Estate argues that (1) Rossi did not "allege or prove the source or origin of the $1,422,700 they sought in reduction" and (2) the trial court erred by applying Second District precedent from *Perkey*, 2013 IL App (2d) 120470, to conclude that a judgment may be reduced by the amount of medical bills that the medical providers had written-off, pursuant to section 2-1205 of the Code; instead, the Estate contends that the Fourth District case of *Miller v.*

*Sarah Bush Lincoln Health Center*, 2016 IL App (4th) 150728, 56 N.E.3d 599, should be applied to the facts of this case. *Miller* held that under section 2-1205 of the Code, a defendant is not entitled to, and the trial court may not order, a reduction of the judgment based on write-offs. We agree with the Estate that the written-off medical bills should not have been used to reduce the jury's verdict.

¶ 148                    a. The Applicable Law and the Standard of Review

¶ 149          Section 2-1205 of the Code provides as follows:

"Reduction in amount of recovery. An amount equal to the sum of (i) 50% of the benefits provided for lost wages or private or governmental disability income programs, *** and (ii) 100% of the benefits provided for medical charges, hospital charges, or nursing or caretaking charges, which have been paid, or which have become payable to the injured person by any other person, corporation, insurance company or fund in relation to a particular injury, shall be deducted from any judgment in an action to recover for that injury based on an allegation of negligence *** on the part of a licensed hospital or physician; provided, however, that:

(1) Application is made within 30 days to reduce the judgment;

(2) Such reduction shall not apply to the extent that there is a right of recoupment through subrogation, trust agreement, lien, or otherwise;

(3) The reduction shall not reduce the judgment by more than 50% of the total amount of the judgment entered on the verdict;

(4) The damages awarded shall be increased by the amount of any insurance premiums or the direct costs paid by the plaintiff for such benefits in the

- 34 -

2 years prior to plaintiff's injury or death or to be paid by the plaintiff in the

future for such benefits; and

(5) There shall be no reduction for charges paid for medical expenses

which were directly attributable to the adjudged negligent acts or omissions of the

defendants found liable." 735 ILCS 5/2-1205 (West 2020).

¶ 150 In 2013, the Second District issued an opinion analyzing, among other issues, the meaning of the phrase in subsection (2) that " '[s]uch reduction shall not apply to the extent that there is a right of recoupment through subrogation, trust agreement, lien, or otherwise.' " (Emphasis omitted.) *Perkey*, 2013 IL App (2d) 120470, ¶ 110 (quoting 735 ILCS 5/2-1205(2) (West 2010)). The plaintiffs in that case argued that if a right to recoupment existed, then the statute barred any request for reduction. *Id.* The Second District disagreed, concluding that the statute merely "limits the reduction by only the extent of, or amount of, the right to recoupment." *Id.* ¶ 112. Ultimately, the Second District reversed the trial court's denial of the motion to reduce judgment, allowing reduction of the judgment based on paid or payable medical expenses that lacked a right of recoupment. *Id.* ¶¶ 120-23.

¶ 151 In 2016, this court also analyzed the language of section 2-1205 of the Code, addressing whether that section allowed for a reduction of judgment based on written-off medical expenses. *Miller*, 2016 IL App (4th) 150728, ¶ 17. This court concluded that "[b]ecause the plain language of section 2-1205 *** does not allow for a defendant to reduce a judgment by an amount that was neither paid to medical providers nor payable to the plaintiff, the trial court erred in reducing the judgment in this case." *Id.* ¶ 21. In so holding, this court noted that although *Perkey* allowed the judgment in that case to be reduced by the amount of written off

medical expenses, the Second District did not actually analyze that issue because different arguments were made in that case. *Id.*

¶ 152    Because this case involves a question of statutory interpretation, we apply a *de novo* standard of review. *Id.* ¶ 8.

¶ 153                                b. This Case

¶ 154    We adhere to what this court wrote in *Miller* and conclude that the trial court erred by reducing the jury's verdict by the written-off medical bills.

¶ 155    Further, we are not persuaded by Rossi's policy arguments that we should revisit this court's decision in *Miller*. We reiterate that the plain language of section 2-1205 does not allow for a reduction in judgment based on written-off medical expenses. *Id.* ¶ 21.

¶ 156    Accordingly, we (1) conclude that the trial court erred when it reduced the judgment by $1,126,630.83 for written-off medical expenses, (2) reverse the court's order granting that reduction, and (3) remand with directions to the trial court to reduce the judgment by only $296,069.17—namely, the amounts paid by Cindy's insurance company.

¶ 157                        B. Rossi's Claims on Cross-Appeal

¶ 158                        1. *Lay Testimony Regarding the Standard of Care*

¶ 159    In his cross-appeal, Rossi first argues that he was unfairly prejudiced by the jury's hearing what Rossi calls lay witness testimony regarding (1) the article Tyman found about Wernicke's being a risk of bariatric surgery and (2) how Carolyn gave the article to hospital staff at OSF Rockford. Rossi asserts that this testimony was tantamount to a medical opinion and influenced the jury's understanding of the standard of care. Specifically, Rossi contends that Tyman's testifying that she found an article that discussed Cindy's then-undiagnosed condition, using an internet search engine, amounted to testimony that a reasonably competent surgeon

would or should have been aware of that same article, which deeply prejudiced Rossi. We disagree. Because we conclude that Rossi was not prejudiced by Tyman's testimony, we need not determine the propriety of the introduction of the article into evidence.

¶ 160                    a. The Applicable Law and the Standard of Review

¶ 161        Trial courts have discretion to decide whether evidence is relevant and admissible, and such decisions are reviewed for an abuse of that discretion. *Peach v. McGovern*, 2019 IL 123156, ¶ 25, 129 N.E.3d 1249. An abuse of discretion occurs only when no reasonable person would take the position adopted by the trial court. *Id.* "Erroneous evidentiary rulings are only a basis for reversal if the error was substantially prejudicial and affected the outcome of trial." (Internal quotation marks omitted.) *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 39, 97 N.E.3d 173. Erroneously admitted evidence that is cumulative and does not otherwise prejudice the objecting party is harmless. *Id.* The party seeking reversal has the burden of showing prejudice. *Blockmon v. McClellan*, 2019 IL App (1st) 180420, ¶ 47, 143 N.E.3d 279.

¶ 162                            b. This Case

¶ 163        As an initial matter, we thank the trial court for its detailed written order denying the Estate's and Rossi's motions for a new trial. In the court's order, it concluded that Tyman's testimony did not prejudice Rossi. Although we found the trial court's order very helpful in understanding this issue, we note that we are not convinced the trial court's allowing Tyman to testify regarding the name of the article she found and how she found it was, in fact, error, which is what the trial court ultimately decided after all of the evidence at trial had been presented.

¶ 164        Rossi argues that Tyman's lay testimony was used to establish the applicable standard of care, but that assertion requires an inference that Tyman's testimony actually

- 37 -

pertained to the standard of care. Importantly, at no point did Tyman ever mention (1) the standard of care, (2) what a doctor should have done, or (3) what information the article contained. Instead, she merely testified that she had found an article that appeared to relate to the symptoms Cindy was suffering and delivered it to her parents, who then delivered it to Cindy's treatment providers. We note that those treatment providers ultimately appear to have used the article in an effort to treat Cindy, as shown not only by Rifkin's progress note, but also by Rossi's testimony regarding Rifkin's note.

¶ 165　　　　Testimony regarding the subject of Tyman's locating the article was presented four times during the Estate's case-in-chief: (1) when Tyman testified, (2) when Rossi testified as an adverse witness, (3) when Carolyn (Cindy's and Tyman's mother) testified, and (4) when Frantzides (the Estate's expert witness) testified. Rossi's counsel made no objection when Rossi and Carolyn testified about this subject. When Tyman began to testify about it, Rossi's counsel said only, "Judge, I'd just renew my objection." The trial court responded, "Overruled. Go ahead." Because Rossi's counsel did not state with specificity the objection he was renewing, we are left to infer he meant his objection to the article as specified in his pretrial motion *in limine*, which the court denied.

¶ 166　　　　Frantzides' testimony about this subject came about when Rossi's counsel cross-examined him. Rossi's counsel showed Frantzides the article and asked the following question: "[T]his is the article that Cynthia Overstreet's sister found. Do you recall reading about that in your work on this case? Yes?"

¶ 167　　　　Frantzides responded, "No, I don't remember that, but I know that she did a search of the internet, and she found it."

¶ 168        Illinois Rule of Evidence 103(b)(3) (eff. Oct. 15, 2015) provides that "[i]n civil trials, even if the court rules before or at trial on the record concerning the admission of evidence, a contemporaneous trial objection *** must be made to preserve a claim of error for appeal." Moreover, just six months before the trial in this case, this court wrote the following in a medical malpractice case about a party's failure to object when the trial court denied that party's pretrial motion *in limine* to bar evidence: "[A] contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review." (Internal quotation marks omitted.) *Arkebauer v. Springfield Clinic*, 2021 IL App (4th) 190697, ¶ 61.

¶ 169        Rule 103(b)(3) and *Arkebauer* make clear that in order for Rossi to preserve his claim that the trial court erred by denying his motion *in limine* to bar testimony regarding Tyman and the article, Rossi needed to object anew at trial whenever that subject arose. However, Rossi failed to do so.

¶ 170        Indeed, Rossi's counsel made no objection at trial to the testimony of Rossi and Carolyn when they testified about that subject. Not only did he fail to object to the testimony of Frantzides about that subject, he elicited it.

¶ 171        Assuming for the sake of argument that Rossi's counsel's abrupt and ambiguous statement before Tyman testified about the article—namely, "Judge, I'd just renew my objection"—was sufficient, absent any context or further explanation, to preserve Rossi's claim of error regarding Tyman's testimony, Rossi's counsel clearly failed to preserve the argument first made in the motion *in limine* regarding Tyman and the article when he failed to additionally object at trial to testimony about that subject given by Rossi, Carolyn, and Frantzides.

¶ 172        Nonetheless, even if the above testimony were improper, we conclude that it was not unduly prejudicial because (1) the evidence was merely cumulative of properly admitted

evidence, which was heard over several days, (2) the jury was reminded multiple times, both by the trial court and the parties in closing argument, what constituted proper standard of care testimony, and (3) the court cured any impropriety by admonishing the jury not to consider Tyman's testimony regarding the article.

¶ 173    Rossi testified Tyman found the article and sent it to her mother. He also acknowledged that the article was in publication and available prior to October 2007. The note written by Rifkin, which stated Cindy's "[f]amily found articles of gastric bypass with postop vomiting, leading to Wernicke's encephalopathy *** I was unaware of the association with bypass gastrectomy. Have started thiamine," was read to the jury without objection. Further, both parties' experts testified that Wernicke's was a known risk of bariatric surgery at the time Cindy's surgery was performed. Accordingly, Tyman's testimony was merely cumulative of what had already been properly introduced into the record. See *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1013, 832 N.E.2d 331 (2005) ("When erroneously admitted evidence is cumulative and does not otherwise prejudice the objecting party, error in its admission is harmless.").

¶ 174    In addition, we reiterate that the jury was told multiple times what constitutes standard of care evidence and was given curative instructions for the jurors to disregard any testimony about the article. The trial court admonished the jury not to consider Tyman's testimony and gave Illinois Pattern Jury Instructions, Civil, No. 105.01 (approved Apr. 2020), instructing the jury that it must rely on only expert opinion testimony in determining the standard of care. In his closing argument, Rossi emphasized that only expert testimony from Frantzides, Millikin, and Rossi could establish the standard of care, concluding, "Your discussion of what was or was not required begins and ends with those three." The Estate, in its closing argument,

also reminded the jury to decide the standard of care based on the expert testimony—specifically Frantzide's and Millikan's.

¶ 175    Because we presume that jurors follow the instructions of the trial court (*People v. Nixon*, 2016 IL App (2d) 130514, ¶ 44, 53 N.E.3d 301) and Tyman's testimony was merely cumulative of other, properly admitted evidence about the article, we conclude that Rossi was not prejudiced by her testimony. Accordingly, the trial court properly denied his motion for new trial.

¶ 176                    2. *Prejudgment Interest*

¶ 177    Rossi argues that the prejudgment interest statute (735 ILCS 5/2-1303(c) (West Supp. 2021)) is unconstitutional because it (1) interferes with the fundamental right to a trial by jury and the jury's determination of damages, (2) violates due process by providing for double recovery and interfering with vested rights, (3) constitutes impermissible special legislation under the Illinois Constitution and violates equal protection, and (4) was passed in violation of the three-readings rule. We disagree and affirm.

¶ 178                    a. The Applicable Law

¶ 179                    i. *The Statutory Language at Issue*

¶ 180    Rossi challenges the constitutionality of the prejudgment interest statute, which is contained in paragraph (c) of section 2-1303 of the Code. See *id.* The legislature added paragraph (c) to section 1303 in 2021 and declared that it would become effective on July 1, 2021. Pub. Act 102-6, § 5 (eff. July 1, 2021) (adding 735 ILCS 5/2-1303(c)). Paragraph (c) provides, in relevant part, the following:

> "(c) In all actions brought to recover damages for personal injury or
>
> wrongful death resulting from or occasioned by the conduct of any other person

or entity, whether by negligence, willful and wanton misconduct, intentional conduct, or strict liability of the other person or entity, the plaintiff shall recover prejudgment interest on all damages, except punitive damages, sanctions, statutory attorney's fees, and statutory costs, set forth in the judgment. Prejudgment interest shall begin to accrue on the date the action is filed. If the plaintiff voluntarily dismisses the action and refiles, the accrual of prejudgment interest shall be tolled from the date the action is voluntarily dismissed to the date the action is refiled. In entering judgment for the plaintiff in the action, the court shall add to the amount of the judgment interest calculated at the rate of 6% per annum on the amount of the judgment, minus punitive damages, sanctions, statutory attorney's fees, and statutory costs. If the judgment is greater than the amount of the highest written settlement offer made by the defendant within 12 months after the later of the effective date of this amendatory Act of the 102nd General Assembly or the filing of the action and not accepted by the plaintiff within 90 days after the date of the offer or rejected by the plaintiff, interest added to the amount of judgment shall be an amount equal to interest calculated at the rate of 6% per annum on the difference between the amount of the judgment, minus punitive damages, sanctions, statutory attorney's fees, and statutory costs, and the amount of the highest written settlement offer. If the judgment is equal to or less than the amount of the highest written settlement offer made by the defendant within 12 months after the later of the effective date of this amendatory Act of the 102nd General Assembly or the filing of the action and not accepted by the plaintiff within 90 days after the date of the offer or rejected by the plaintiff,

no prejudgment interest shall be added to the amount of the judgment. For the

purposes of this subsection, withdrawal of a settlement offer by defendant shall

not be considered a rejection of the offer by the plaintiff. Notwithstanding any

other provision of this subsection, prejudgment interest shall accrue for no longer

than 5 years.

                    ***

        For any personal injury or wrongful death occurring before the effective

date of this amendatory Act of the 102nd General Assembly, the prejudgment

interest shall begin to accrue on the later of the date the action is filed or the

effective date of this amendatory Act of the 102nd General Assembly." 735 ILCS

5/2-1303(c) (West Supp. 2021).

¶ 181                          ii. *The Standard of Review*

¶ 182        "The constitutionality of a statute is a question of law that is reviewed *de novo*."

*Walker v. Chasteen*, 2021 IL 126086, ¶ 30, 183 N.E.3d 153. "Statutes carry a strong presumption

of constitutionality, and this court will construe a statute to preserve its constitutionality if

reasonably possible. [Citation.] The party challenging the constitutionality of a statute bears the

burden of establishing the statute's invalidity." *Id.*

¶ 183                          iii. *The Constitutionality of Statutes*

¶ 184        "When a statute is challenged as unconstitutional under substantive due process or

equal protection, our analysis is essentially the same." *Schultz v. Lakewood Electric Corp.*, 362

Ill. App. 3d 716, 720, 841 N.E.2d 37, 42 (2005). Similarly, challenges to statutes under the

special legislation clause are generally evaluated under the same standards that are applicable to

an equal protection challenge. *Piccioli v. Board of Trustees of the Teachers' Retirement System*,

- 43 -

2019 IL 122905, ¶ 20, 137 N.E.3d 745. When a fundamental right is not at issue, courts apply the rational basis test. *Id.* "Under [the rational basis] test, we ask whether the statutory classification is rationally related to a legitimate state interest." *Id.* "If there is any conceivable basis for finding a rational relationship, the law will be upheld." (Internal quotation marks omitted.) *Id.*

¶ 185    Before continuing, we note that Rossi and his *amici*, the Illinois Health and Hospital Association (IHHA), raise numerous objections to the prejudgment interest statute, based on the "poor fit" between the statute's ends and its means of achieving those ends. Among other things, they assert that (1) the statute will not lead to more settlements, faster case resolution, and less crowded dockets, (2) health care costs and malpractice premiums will greatly increase, and (3) health care providers will stop providing services or will be dissuaded from becoming nurses, doctors, and technicians in the first place. However, Rossi and IHHA's parade of horribles, even if true, is a matter calling for legislative, not judicial, judgment.

¶ 186    "[T]he fact that a law might be ill-conceived does not, in itself, create a constitutional problem for us to fix ***." *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704, ¶ 28, 54 N.E.3d 825. "The judgments made by the legislature in crafting a statute are not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.*, 217 Ill. 2d 221, 240, 840 N.E.2d 1174, 1185-86 (2005). Accordingly, "[w]hether a statute is wise or whether it is the best means to achieve the desired result are matters left to the legislature, not the courts." *Id.*

¶ 187        Rossi's policy arguments are of no concern to this court; the only question for us to decide is whether the prejudgment interest statute violates the Illinois Constitution. We conclude that it does not.

¶ 188                                b. The Right to Trial by Jury

¶ 189        Rossi first argues that the prejudgment interest statute violates his constitutional right to a trial by jury as "heretofore enjoyed" under the Illinois Constitution. Ill. Const. 1970, art. I, § 13. Rossi argues that the statute (1) deters defendants from exercising the right to a jury trial, (2) interferes with the jury's role in determining whether to award damages and the amount of those damages, and (3) violates the separation of powers. We disagree.

¶ 190        To begin, the statute does not mention or involve a jury. The statute instructs the trial court (1) when prejudgment interest is available, (2) how to calculate the time period for which interest accrued, and (3) the amount of the judgment to which interest applies. The jury simply does not enter the equation.

¶ 191        All parties agree that prejudgment interest in Illinois is not available at common law and may be recovered only as provided by statute. " '[I]t is well settled that interest is not recoverable absent a statute or agreement providing for it.' " *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 257, 856 N.E.2d 389, 412 (2006) (quoting *City of Springfield v. Allphin*, 82 Ill. 2d 571, 576, 413 N.E.2d 394, 396 (1980)); see *id.* at 256 ("A judgment is the judicial act of the court. In contrast, the right to judgment interest, apart from contract, 'does not emanate from the controversy, or from the judgment, or from anything of a judicial nature. *** The recovery of interest in this State, not contracted for, finds its only authority in the statute. It is purely statutory.' *Blakeslee's Storage Warehouses, Inc. v. City of Chicago*, 369 Ill. 480, 482-83[, 17 N.E.2d 1] (1938)."). The prejudgment interest statute cannot interfere with the right

heretofore enjoyed to have a jury determine damages. The jury has never been involved in calculating or awarding prejudgment interest, and the prejudgment interest statute does not interfere with the right to a jury trial in any respect.

¶ 192    Further, when the Illinois Supreme Court has upheld as constitutional other sections of the Code despite arguments that those sections impede the right to jury trial, the court expressly noted that those sections were "no greater impediment to the jury-trial right than a statute setting a predetermined interest rate for judgments." *Bernier v. Burris*, 113 Ill. 2d 219, 237, 497 N.E.2d 763, 772 (1986).

¶ 193    And courts in our sister states have similarly concluded that their prejudgment interest statutes (1) were constitutional and (2) did not interfere with the right to a jury trial. See *Oden v. Schwartz*, 71 A.3d 438, 456-57 (R.I. 2013) (concluding that prejudgment interest statute was rationally related to legitimate state interest and did not affect right to trial by jury because prejudgment interest was not "damages"); *Galayda v. Lake Hospital Systems, Inc.*, 71 Ohio St. 3d 421, 428, 1994-Ohio-64, 644 N.E.2d 298, 302-03 (rejecting arguments identical to Rossi's and holding that prejudgment interest statute "does not violate the fundamental constitutional right to trial by jury"). We agree with the reasoning of these cases and conclude they offer further support for the Illinois Supreme Court's conclusion in *Bernier*.

¶ 194    Rossi also claims that the prejudgment interest statute interferes with the jury's role as fact finder, specifically, as it relates to the issue of determining the amount of damages. Rossi asserts that because the jury is instructed to determine the "duration" of the injury, the jury is necessarily permitted to and does compensate plaintiffs for the lack of access to damages for the duration of the lawsuit. See IPI Civil (2011) No. 30.01. We disagree.

¶ 195        Juries are presumed to follow instructions (*Allen v. Sarah Bush Lincoln Health Center*, 2021 IL App (4th) 200360, ¶ 192, 185 N.E.3d 518), and no Illinois pattern jury instruction even hints that a jury may compensate a plaintiff for the time value of money during litigation. See *Tri-G, Inc.*, 222 Ill. 2d at 252 (explaining that juries award damages based solely on the instructions given by the trial court and may not award unauthorized damages). Nor has Rossi pointed to any cases involving expert testimony or closing arguments on the subject of prejudgment interest, which would lend some support for the alleged practice.

¶ 196        Rossi does not cite any cases holding that prejudgment interest constitutes "damages" under Illinois law or that a jury is permitted to award prejudgment interest as "damages" in tort cases. The Illinois Supreme Court has clearly stated that "assessment of interest [upon a jury's damages award between the verdict and the trial court's entry of formal judgment] is neither a penalty nor a bonus, but instead a preservation of the economic value of an award from diminution caused by delay." *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 157 Ill. 2d 282, 301, 626 N.E.2d 213, 223 (1993). The purpose of section 2-1303 is to "preserve[ ] the value of the liquidated obligation by compensating the judgment creditor for delays in payment." *Id.* at 295. Accordingly, Rossi's characterization of judgment interest as "damages" is incorrect.

¶ 197        Because prejudgment interest "is neither a penalty nor a bonus, but instead a preservation of the economic value of an award" (*id.* at 301), the statute does not interfere with the jury's determination of damages. Because damages are the province of the jury and prejudgment interest—not being damages—is the province of the legislature, the statute does not violate separate of powers principles. *Tri-G, Inc.*, 222 Ill. 2d at 256 ("[T]he right to judgment

interest, apart from contract, 'does not emanate from the controversy, or from the judgment, or from anything of a judicial nature.' *** [Citation.]").

¶ 198                              c. Rossi's Due Process Arguments

¶ 199          Rossi also argues the prejudgment interest statute is unconstitutional and violates due process because it (1) applies retroactively to increase damages and destroy a complete defense, (2) permits a double recovery because juries already include the time value of money when assessing past damages, and (3) penalizes defendants for a plaintiff's delays.

¶ 200          At the outset, because we have already concluded that the prejudgment interest statute (1) does not constitute "damages" and (2) does not affect the right to a trial by jury, we need not address those arguments again. We further note that the Illinois Appellate Court has rejected arguments similar to those raised by Rossi and IHHA here, challenging the constitutionality of postjudgment interest, and we agree with those holdings. See *Mikolajczyk v. Ford Motor Co.*, 374 Ill. App. 3d 646, 677-78 (2007), *rev'd on other grounds*, 231 Ill. 2d 516 (2008); *Schultz*, 362 Ill. App. 3d 716.

¶ 201                              i. *Unconstitutionally Retroactive*

¶ 202          Rossi argues that because the common law did not permit the recovery of prejudgment interest when the injury occurred and the lawsuit was filed in this case, he had a vested right *against* the imposition of prejudgment interest, and the statute violates that right.

¶ 203          We disagree. "[N]o person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit." (Internal quotation marks omitted.) *Wingert v. Hradisky*, 2019 IL 123201, ¶ 33, 131 N.E.3d 535. "No constitutional right is violated by changing a remedy available at common law. [Citation.] A vested right must be based upon more than an expectation of the continuance of existing law ***." *Trexler v. Chrysler Corp.*, 104 Ill.

2d 26, 30, 470 N.E.2d 300, 302 (1984). In *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 187, 950 N.E.2d 1136, 1150 (2011), the Illinois Supreme Court noted, "It has long been held that the legislature may increase, decrease or eliminate a statutory interest rate as long as it does not interfere with rights which have already accrued and vested under a previous statutory rate." Because (1) prejudgment interest was not previously authorized by statute and (2) the jury had not entered a verdict (under the common law rule of no prejudgment interest) prior to the effective date of the prejudgment interest statute, Rossi did not have a vested right against being charged prejudgment interest.

¶ 204　　　　However, even assuming Rossi did have a vested right against the imposition of prejudgment interest, the statute does not apply retroactively to violate that right. The plain text of the statute demonstrates that it applies only prospectively: "For any personal injury or wrongful death occurring before the effective date of this amendatory Act ***, the prejudgment interest shall begin to accrue on the later of the date the action is filed or the effective date of this amendatory Act ***." 735 ILCS 5/2-1303(c) (West Supp. 2021).

¶ 205　　　　Here, the Estate filed its complaint in 2012. Under the plain text of the statute, the Estate could only recover prejudgment interest beginning on the effective date of the statute, July 1, 2021, to the date of the judgment on September 29, 2021, a period of three months. Because the statute provides for prejudgment interest only in the years *after* its enactment, it does not apply retroactively to Rossi.

¶ 206　　　　Because prejudgment interest "is neither a penalty nor a bonus, but instead a preservation of the economic value of an award" (*Illinois State Toll Highway Authority*, 157 Ill. 2d at 301), the statute does not (1) impose new costs on past behavior or (2) increase a damage award.

¶ 207                                    ii. *Double Recovery*

¶ 208            For the reasons we explained earlier (*supra* ¶¶ 187-90), the prejudgment interest

statute does not affect the amount of a plaintiff's recovery of damages, and Rossi provides no

relevant authority to support his assertion that juries in this state are, in fact, compensating

personal injury and wrongful death plaintiffs for the time value of monetary damages.

Accordingly, we conclude the statute does not permit multiple recoveries for the same injury.

¶ 209            Alternatively, defendants argue that juries are already awarding prejudgment

interest to personal injury plaintiffs. However, based again on our prior analysis (*supra*

¶¶ 187-90), we reject Rossi's contention that somehow, despite well-settled law, juries regularly

award personal injury and wrongful death plaintiffs prejudgment interest.

¶ 210                              iii. *The Problem of Plaintiff's Delay*

¶ 211            Rossi next claims that the prejudgment interest statute "arbitrarily penalizes even

the most diligent defendant for any delay—regardless of whether the defendant is to blame for it,

and even if the delay is the plaintiff's fault." As an initial matter, we note again that the supreme

court has held that judgment interest is not a "penalty." *Illinois State Toll Highway Authority*,

157 Ill. 2d at 301. Delay attribution is irrelevant; the interest calculation is the same regardless.

¶ 212            To the extent the statute is concerned with delay, the legislature seems to have

reached a determination regarding how to balance the issue by placing several limits on the

amount of prejudgment interest a plaintiff can receive. Given these limitations, we conclude that

the prejudgment interest statute reflects a legislative determination of the balance between

incentivizing both parties to settle and preventing either party from profiting by delay.

¶ 213                    d. Special Legislation and Equal Protection

¶ 214          Next, Rossi argues that the prejudgment interest statute violates the Illinois

Constitution's prohibition against special legislation. See Ill. Const. 1970, art. IV, § 13.

Specifically, Rossi contends that the statute impermissibly singles out personal injury and

wrongful death plaintiffs for a benefit unavailable to any other tort victim without a rational basis

to do so. We disagree.

¶ 215                              i. *The Applicable Law*

¶ 216          "The special legislation clause prohibits the General Assembly from conferring a

special benefit or privilege upon one person or group and excluding others that are similarly

situated." *Crusius v. Illinois Gaming Board*, 216 Ill. 2d 315, 325, 837 N.E.2d 88, 95 (2005).

Reviewing courts apply a two-part test to determine whether a law constitutes special legislation.

*Piccioli*, 2019 IL 122905, ¶ 18. "First, we must decide whether the statutory classification at

issue discriminates in favor of a select group and against a similarly situated group. Second, if

the classification does so discriminate, we must determine whether the classification is

arbitrary." *Id.*

¶ 217                              ii. *This Case*

¶ 218          Here, there is no question that the statute confers a benefit on a select group of

people—namely, personal injury and wrongful death plaintiffs that receive a favorable judgment.

Accordingly, we move to the second step of the analysis—namely, whether there is a rational

basis for the classification. *Id.* ¶ 20.

¶ 219          Rossi relies upon *Allen v. Woodfield Chevrolet, Inc.*, 208 Ill. 2d 12, 802 N.E.2d

752 (2003), to support his position, but we conclude that case is distinguishable. In *Allen*, the

Illinois Supreme Court concluded that the amendments to the Consumer Fraud Act arbitrarily

benefitted car dealers when sued under the Act, who were no different than any other consumer fraud defendant. *Id.* at 29-33. Here, by contrast, the prejudgment interest statute is based on the type of harm suffered by the plaintiff and not based on the type of person responsible for that harm. Personal injury and wrongful death plaintiffs suffer unique challenges after they are injured and while they seek compensation. They have often suffered life altering, catastrophic damages for which prompt resolution is necessary to avoid great financial hardship in addition to the injuries themselves. Their bodily integrity has been violated by the wrongful conduct in a way that victims of property or reputational torts do not suffer. These special characteristics constitute an entirely reasonable basis on which the legislature could decide to permit prejudgment interest to this class of plaintiffs.

¶ 220                              e. The Three-Readings Rule

¶ 221        Finally, Rossi and his *amici*, IHHA, argue that this court should declare the prejudgment interest statute unconstitutional because it was passed in violation of the three-readings rule of the Illinois Constitution. See Ill. Const. 1970, art. IV, § 8(d). That requirement is set forth in section 8(d), which provides as follows:

> "(d) A bill shall be read by title on three different days in each house. A bill and each amendment thereto shall be reproduced and placed on the desk of each member before final passage.
>
> * * *
>
> The Speaker of the House of Representatives and the President of the Senate shall sign each bill that passes both houses to certify that the procedural requirements for passage have been met." *Id.*

¶ 222　　　　　Defendants acknowledge that the Illinois Supreme Court has adopted the "enrolled bill doctrine," which provides that the certification by the President of the Senate and the Speaker of the House that constitutional procedures were complied with to pass the legislation at issue (1) provides conclusive evidence of compliance and (2) is not subject to judicial review. *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 328-29, 786 N.E.2d 161, 171 (2003). Nonetheless, defendants point to the supreme court's (1) repeated expressions of frustration at the legislature's failure to follow the three-readings rule, demonstrating the legislature's inability to police itself, and (2) threats to reexamine whether the enrolled bill doctrine should be employed in the future if the legislature continues to flout the constitution. Defendants contend that day has come, and this court should strike down the prejudgment interest statute because its enactment was in violation of the three-readings rule.

¶ 223　　　　　The Estate and its *amici*, the Illinois Trial Lawyers Association (ITLA), ask this court to follow the law of Illinois as stated by the supreme court. They remind us that (1) we are constitutionally bound by Illinois Supreme Court precedent and (2) the matter of continued adherence to the enrolled bill doctrine is for that court alone to decide. Mindful of the limits of this court's authority, we agree with the Estate and ITLA that we must follow the supreme court's decisions declaring the enrolled bill doctrine to be the law of Illinois. Accordingly, this court cannot declare the prejudgment interest statute unconstitutional, even though it was passed in violation of the three-readings rule.

¶ 224　　　　　Despite this conclusion, we wish to express our concern over the legislature's continued blatant flouting of constitutional provisions ratified by the people of the State of Illinois in 1970 when they voted to adopt the new constitution. We first discuss how the prejudgment interest statute was enacted.

¶ 225                    i. *The Enactment of the Prejudgment Interest Statute*

¶ 226         Senate Bill 0072, which ultimately became the prejudgment interest statute, was initially titled "An Act concerning civil law." 102d Ill. Gen. Assem., Senate Bill 0072, 2021 Sess. In the Senate, that bill was described as "[c]reat[ing] the Electronic Wills and Remote Witnesses Act." Bill Status of SB0072, Ill. Gen. Assembly, https://ilga.gov/legislation/BillStatus.asp?GAID=16&GA=102&DocNum=72&DocTypeID=SB&SessionID=110&LegID=128357&SpecSess=&Session= (last visited June 28, 2023) [https://perma.cc/7MSB-D6RS]. On its third reading in the Senate, on March 10, 2021, the transcript provides "Senate Bill 72. (Secretary reads title of bill) 3rd Reading of the bill." 102d Ill. Gen. Assem., Senate Proceedings, March 10, 2021, at 10 (statements of Secretary Anderson). The Senate then passed Senate Bill 72.

¶ 227        After its first reading in the House, SB0072 was amended on March 17, 2021, by "[r]eplac[ing] everything after the enacting clause" with text concerning the award of prejudgment interest. *Bill Status of SB0072*, Ill. Gen. Assembly, https://ilga.gov/legislation/BillStatus.asp?GAID=16&GA=102&DocNum=72&DocTypeID=SB&SessionID=110&LegID=128357&SpecSess=&Session= (last visited June 28, 2023) [https://perma.cc/7MSB-D6RS]. The bill received a second reading in the House on that same day and was further amended into its present form on March 18, 2021. At its third reading, also on March 18, the bill was read by title as "Senate Bill 72, a Bill for an Act concerning civil law. Third Reading of this Senate Bill." 102d Ill. Gen. Assem., House Proceedings, March 18, 2021, at 96 (statements of Clerk Hollman). After debate, the House passed the bill, the roll call of which describes the bill as follows: "SENATE BILL 72 PROBATE-ELECTRONIC WILLS." Senate Bill 72 then returned to the Senate.

¶ 228        Despite the House's completely transforming the bill, the Senate concurred in the House amendments one week after the third reading in the House. The only Senate action regarding now-transformed Senate Bill 72, which no longer had anything to do with electronic wills or remote witnesses, was to vote on March 25, 2021, to concur with the House amendments to that bill. Senate Bill 72, as amended by the House, was never read three times in the Senate.

¶ 229        ITLA insists that Senate Bill 72, the bill that would become the prejudgment interest statute, was read by its title, which ITLA claims was "SB0072," in each house three times. However, the Illinois Supreme Court has made clear that the title of a bill is an important consideration in determining a bill's scope. See *People v. Burdunice*, 211 Ill. 2d 264, 268, 811 N.E.2d 678, 681 (2004); *People v. Cervantes*, 189 Ill. 2d 80, 85-86, 723 N.E.2d 265, 268 (1999); *People v. Reedy*, 186 Ill. 2d 1, 9-12, 708 N.E.2d 1114, 1118-19 (1999); *Johnson v. Edgar*, 176 Ill. 2d 499, 516-18, 680 N.E.2d 1372, 1381-82 (1997). Those cases clearly identify the "title" of a bill to be that portion that states, "an Act concerning ___" and *not* the bill's numerical designation. See *Burdunice*, 211 Ill. 2d at 268; *Cervantes*, 189 Ill. 2d at 85; *Reedy*, 186 Ill. 2d at 9; *Johnson*, 176 Ill. 2d at 516. ITLA's claim that the legislature's use of a mere numerical denomination is sufficient makes a mockery of 1970 constitution's requirement that the bill be read by its title on three different days.

¶ 230        The supreme court has given plenty of guidance on what a sufficient title is; it is hardly an onerous burden. Here, for example, in its roll call vote, the House set forth the title of Senate Bill 0072 as "Probate-Electronic Wills," which is a good example for title drafting. In this very case, the legislature could have used the description it used on its own website for SB0072: "CIV PRO-PREJUDGMENT INTEREST." See *Bill Status of SB0072*, Ill. Gen. Assembly, https://ilga.gov/legislation/BillStatus.asp?GAID=16&GA=102&DocNum=72&DocTypeID=

SB&SessionID=110&LegID=128357&SpecSess=&Session= (last visited June 28, 2023) [https://perma.cc/7MSB-D6RS].

¶ 231     We agree with the Fifth District's observations in *Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035, ¶ 43, in which it wrote the following:

> "The three-reading requirement ensures that the legislature is fully aware of the contents of the bills upon which they will vote and allows the lawmakers to debate the legislation. Equally relevant to the three-reading rule is the opportunity for the public to view and read a bill prior to its passage, thereby allowing the public an opportunity to communicate either their concern or support for proposed legislation with their elected representatives and senators. Taken together, two foundations of the bedrock of democracy are decimated by failing to require the lawmakers to adhere to the constitutional principle."

¶ 232     A bill's being read by title on three different days in *each house* deliberately slows down the legislative process so that legislators—and, more importantly, the general public—have time to review the bill, discern and evaluate its contents, form an opinion, and perhaps share that opinion with legislators and the public at large.

¶ 233                    ii. *The Problem With the Enrolled Bill Doctrine*

¶ 234     In its brief, ITLA makes the following argument:

> "Boldly trespassing upon the legislature's constitutional authority to regulate its own procedure would create chaos because every single statute passed using the same procedure as *Section 1303(c)* would suddenly be ripe for constitutional challenge. A small sampling of the statutes this court will suddenly open to constitutional challenge include: SAFE-T Act (PA 101-0652) HB 3653,

- 56 -

the Assault Weapons Ban (HB5471 of 102nd GA), the judicial restricting [*sic*] statute (PA 102-0011) SB642, the Clean Energy Jobs Act (PA 1002-0662) SB2408, Cannabis legislation (PA 101-0027) HB1438, the Video Gaming Act (PA 96-0034) HB255, and the Asbestos Statute of Repose (PA 98-1131) SB2221. Defendants' invitation to set-off a legislative tsunami must be rejected."

¶ 235    Perhaps unwittingly, ITLA essentially argues that all of these major pieces of legislation apparently failed to comply with the Illinois Constitution. ITLA is basically saying that the legislature is violating the three-readings rule so much that it would be chaos to make the legislature accountable.

¶ 236    ITLA's warnings about the judiciary "[b]oldly trespassing upon the legislature's constitutional authority to regulate its own procedure" smack of faux outrage about the notion that the legislature could be made to follow the requirements of the Illinois Constitution. Yet, it is hard to fault ITLA or the General Assembly for having such a dismissive attitude. After all, the Illinois Supreme Court has long documented the legislature's complete and utter disregard for the requirements of the Illinois Constitution, but that court has done nothing in response. The only logical conclusion is that the supreme court's "reservation" of the right to revisit the enrolled bill doctrine is nothing but bluster.

¶ 237    The Illinois Supreme Court last suggested some hypothetical line existed that the legislature might cross in *Friends of the Parks*, 203 Ill. 2d at 329, when that court wrote the following: "While separation of powers concerns militate in favor of the enrolled-bill doctrine [citation], our responsibility to ensure obedience to the constitution *remains an equally important concern*." (Emphasis added.)

¶ 238    Justice Heiple, in his partial dissent in *People v. Dunigan*, 165 Ill. 2d 235, 256-58, 650 N.E.2d 1026, 1036-37 (1995), provided a concise and compelling explanation of why the supreme court was legally wrong to interpret section 8(d) as adopting the enrolled-bill doctrine in the first place.

> "The interpretation of a constitutional provision depends, in the first instance, on the plain meaning of its language. Next, it depends on the common understanding of the citizens who, by ratifying the constitution, have given it life. A court looks to the debates of the convention delegates only when a constitutional provision is ambiguous. (*Kalodimos v. Village of Morton Grove*[, 103 Ill. 2d 483, 492-93, 470 N.E.2d 266 (1984).]) There is no ambiguity in the provision requiring the legislature to read a bill on three different days in each house, the provision that a bill receive a majority vote in each house, or the provision requiring the Speaker of the House and the President of the Senate to sign each bill to certify that the procedural requirements for passage have been met.

> If it were deemed desirable to foreclose inquiries into the regularity of the passage of bills, language similar to the enrolled-bill doctrine could have been included within the constitution. There is no such language. Moreover, the Illinois Constitution was adopted at a referendum. It did not become the law of the State by either the discussions of the delegates or by their votes. The constitutional convention merely submitted the document to the public for a vote. There is no way that a voter could interpret the language of the constitution to mean that procedural requirements for the passage of a bill could be overridden by the

- 58 -

signatures of two State officers. In truth, the signatures of the officers are merely *prima facie* evidence that the General Assembly has abided by the requirements of the constitution. In other words, it raises a rebuttable presumption that the requirements for passage have been met.

A literal adherence to this so-called enrolled-bill doctrine means that a bill need never be read or presented in either house, need never receive a majority vote, and need never even be voted on. Two people, the Speaker of the House and the President of the Senate, need merely sign and certify a bill and, unless vetoed by the Governor pursuant to article IV, section 9, the bill becomes *ipso facto* the law of Illinois. Contrary to today's ruling, I believe that the constitutional requirements for the enactment of a bill should be followed and enforced. While separation of powers is a valid doctrine and a presumption of legislative regularity is its proper corollary, this court should reserve the right of review to ensure the General Assembly's compliance with constitutional mandates." *Id.* at 257-58.

¶ 239    For the reasons discussed earlier, the delegates' belief that self-policing would occur was wholly mistaken.

¶ 240    In *Accuracy Firearms, LLC*, 2023 IL App (5th) 230035, ¶¶ 44-45, the Fifth District recently wrote the following:

"To be sure, Illinois is not the only state that has faced or endured repeated ethical lapses associated with gut and replace legislation. However, other states have addressed this issue and demand compliance with the state constitutional mandates. See *Washington v. Department of Public Welfare of Pennsylvania*, 188 A.3d 1135 (Pa. 2018); *State ex rel. Ohio AFL-CIO v. Voinovich*, 631 N.E.2d 582,

1994-Ohio-1 (Ohio 1994); *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74 (Ky. 2018); *League of Women Voters of Honolulu v. State*, 499 P.3d 382 (Haw. 2021).

Our lawmakers take an oath of office to ' "support the constitution of the United States, and the constitution of the state of Illinois." ' 25 ILCS 5/2 (West 2020); Ill. Const. 1970, art. XIII, § 3. The same is required for the circuit court judiciary (705 ILCS 35/2 (West 2020)), as well as the appellate and supreme courts and certain members of the executive branch. Ill. Const. 1970, art. XIII, § 3. Allowing lawmakers to continue to ignore constitutional mandates under the enrolled-bill doctrine, knowing full well the constitutional requirements were not met, belittles the language of the oaths, ignores the need for transparency in government, and undermines the language of this state's constitution."

¶ 241 We wholeheartedly agree with the Fifth District's assessment. This court is disheartened that we are compelled to reject Rossi's challenge out of hand when the violation appears so blatant. This court is placed in a strange position when it is constitutionally required to turn a blind eye to a grave constitutional violation by a co-equal branch of government.

¶ 242          III. CONCLUSION

¶ 243 For the reasons stated, we affirm in part, reverse in part, and remand with directions.

¶ 244 Affirmed in part, reversed in part, and remanded with directions.

*First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 12-L-58; the Hon. Donna R. Honzel, Judge, presiding. |
| **Attorneys for Appellant:** | Patrick M. Flaherty, of Kinnally Flaherty Krentz Loran Hodge & Masur PC, of Aurora, and Bruce R. Pfaff, of Pfaff, Gill & Ports, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Scott L. Howie and Jeffrey E. Eippert, of Donohue Brown Mathewson & Smyth LLC, and Robert Marc Chemers, of Pretzel & Stouffer Chtrd., both of Chicago, and Matthew B. Smith and J. Matthew Thompson, of Quinn, Johnston, Henderson, Pretorius & Cerulo, of Peoria, for appellees. |
| *Amicus Curiae*: | Hugh C. Griffin, of Hall Prangle & Schoonveld, LLC, of Chicago, for *amicus curiae* Illinois Health and Hospital Association. |
| *Amicus Curiae*: | Nicholas Nepustil, of Benjamin & Shapiro, Ltd., of Chicago, for *amicus curiae* Illinois Trial Lawyers Association. |